## J. P. CRAWFORD v. GEORGE W. FERGUSON, *County Judge.*

### No. A-1096. Opinion Filed May 2, 1911.

### (115 Pac. 278.)

1. **RIOT—What Constitutes.** Where three or more persons, without authority of law, combine together, and by means of threats to use force or violence, if accompanied by immediate power of execution, seek to accomplish any unlawful purpose, they are guilty under the law of riot.

2. **CRIMINAL LAW—Enforcement of Law—Unlawful Acts.** The violation of law under the guise of attempting to enforce the law is not only illegal, but it is anarchy.

3. **UNLAWFUL ASSEMBLY—Legality of Purpose—Enforcement of Laws.** The people have the right, in a quiet and peaceable manner, to combine together and organize for the purpose of assisting the officers in the enforcement of law, and they may also take such steps as they may deem necessary for the purpose of carrying out the objects of such organization, taking care at all times to abstain from any illegal act or conduct.

4. **JUDGES—Conduct—Participation in Public Meetings.** Judicial officers should abstain from participating in public meetings in which questions are discussed which might afterwards come before them for decision. A judge should not be a partisan. Whenever he becomes a partisan, his usefulness on the bench is greatly impaired, if not entirely destroyed.

5. **JUDGES—Premature Opinions.** A judge should be careful not to commit himself upon questions of fact or law which may come before him for .decision, until the matter is properly presented in

open court, and both parties have had ample opportunity to be heard.

6.    JUDGES—Disqualification—Prejudice.  There is a great and manifest difference between being prejudiced against the commission of a crime and being prejudiced against a person charged with the commission of such crime.  The fact that a judge is prejudiced against the commission of crime does not disqualify him from presiding at a criminal trial.  He is only disqualified when he has personal bias or prejudice against the defendant, who is on trial before him charged with the commission of a crime.

7.    WITNESSES—Impeachment—Occupation—Companions.  While it is improper to impeach a witness by showing that he has been indicted, arrested, or imprisoned for crime, before conviction, yet his occupation and companions are of his own choosing, and may therefore be shown, when they indicate a want of moral character, for the purpose of impeaching his testimony.  **Slater v. U. S.,** 1 Okla. Cr. 275, 98 Pac. 110, reaffirmed.

8.    WITNESSES—Impeachment—Bootleggers.  When a witness has been convicted of bootlegging, or has the general reputation of being a bootlegger, this fact may be shown for the purpose of affecting his credibility as a witness.

9.    AFFIDAVITS—Authority to Take—Attorneys—Disabilities.  It is improper for a lawyer to act in the double capacity of a notary to take acknowledgments to affidavits, to be used in the trial of a case in which he is the attorney for one of the parties.

(Syllabus by the Court.)

Petition of J. P. Crawford for a writ of mandamus to George W. Ferguson, County Judge.  Petition denied.

*I. H. Lookabaugh,* for petitioner.

*A. L. Emery,* Co. Atty., and *J. P. Wishard,* Asst. Co. Atty., for respondent.

FURMAN, PRESIDING JUDGE.  J. P. Crawford, the petitioner, being prosecuted by information in the county court of Blaine county, Okla., charged with the offense of violating the prohibitory liquor law of the state of Oklahoma, on the 14th day of April, 1911, made application for a change of judge, upon the ground that George W. Ferguson, the judge of the county court of Blaine county, and the respondent herein, was so prejudiced against petitioner that petitioner could not secure a fair and impartial

trial on said charge before respondent; and alleging, further, that about the middle of March, 1911, respondent participated in the action of an organized mob, consisting of more than one hundred persons, which mob visited a number of people in the town of Watonga who were supposed to be violators of the prohibitory liquor law of the state, and commanded such persons to quit their business and leave the town, and threatened said parties with violence in case the commands of said organized mob were not complied with; and that respondent was a leader and one of the spokesmen of said mob. This application was duly sworn to by petitioner. This application being presented to respondent, he declined to certify his disqualification from presiding at the trial of said cause. Therefore, on the 15th day of April, petitioner applied to this court for an alternative writ of mandamus, requiring respondent, either to certify his disqualification to act as said judge or show cause for his refusing to do so. The original application for a change of judge as presented to respondent was attached to and made a part of the petition for a writ of mandamus filed in this court. This matter came on to be heard on the 24th day of April, 1911. Upon a hearing of this case, respondent denied the allegations contained in the petition for mandamus. The petitioner filed a number of affidavits sustaining the allegations contained in his petition.

It is a significant fact that 23 of these affidavits were acknowledged before the attorney for the petitioner. As this matter has not been passed upon by this court before, we will not do more now than say that the authorities all denounce this practice. If it is permitted, the door is opened to all kinds of impositions and frauds. Such conduct must not be repeated. In the future such affidavits will not be received or considered, except as the basis of proceedings against the offending attorney.

If the facts stated in the petition for mandamus had been proved to be true beyond all question, petitioner would be entitled to a change of judge. The conduct therein set forth and described would not only be illegal, but it would amount to a riot.

Section 2497 of Snyder's Comp. Laws of Okla. 1909, is as follows:

"Any use of force or violence, or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law, is riot."

It matters not how good their intentions may be, if three or more persons, without authority of law, combine together, and by threats to use force or violence, if accompanied by immediate power of execution, seek to accomplish any unlawful purpose, they are guilty under the law of riot, and liable to be imprisoned in the state penitentiary for any period not less than three years. A violation of law, when committed even for the purpose of enforcing the law, is not only illegal, but it is anarchy itself. Therefore, if it were proven to this court that the statements in the petition for mandamus were true, it would be the duty of this court to issue the writ prayed for, it matters not what the intention of the parties who committed the acts may have been, even though such mandamus might involve every man in Blaine county. When a violation of law has been proven, this court cannot, Pontius Pilate like, place its fingers upon the public pulse and sustain such violation of law, even though it be demanded by the entire people of a county. Therefore we have no hesitancy in saying that the showing made by the petitioner, if not disproven, would clearly entitle him to a change of judge. Petitioner filed a great many affidavits sustaining his petition. Upon the hearing of this matter, six reputable citizens of Blaine county were placed upon the witness stand, and they denied every material allegation tending to establish prejudice on the part of respondent contained in the petition for mandamus.

In the case of *Slater v. U. S.*, 1 Okla. Cr. 275, 98 Pac. 110, this court held that it was improper, for the purpose of impeaching a witness, to ask him on cross-examination if he had ever been indicted, arrested, or imprisoned for crime before conviction, but this court also held, in the same case, that it is always ad-

missible to inquire into the antecedents of a witness, by showing his occupation, social connections, manner of living, and such matters, for the purpose of affecting his credibility. The reason for this distinction is that the indictment, arrest, and imprisonment of a witness are involuntary on the part of the witness, and result from accusations which are often prompted by malice, and that they are not conclusive as to the guilt of the witness of the offense charged against him, but that the occupation, companions, and associates of a witness are of his own choosing, and indicate his real character. To prevent any misconception upon this question, the case of *Slater v. U. S.,* above quoted, should be carefully examined. We have never modified, and do not expect to modify, any statement contained in that opinion.

Upon the hearing of this matter, the court invited information as to the witnesses who had made affidavits in support of the petition for mandamus. The effect of their affidavits was to charge respondent with having assisted in the organization of a mob, and with being one of the leaders in a riot. If these accusations were true, respondent should not preside at the trial of this cause, but should be removed from office and confined in the penitentiary as a common felon. It was therefore important for this court to know who these men were who had made these serious charges against a judicial officer of the state of Oklahoma. Counsel for petitioner did not give us any information upon this subject. But this matter was gone into by counsel for respondent, and it was shown that these men were professional bootleggers, or the companions and associates of bootleggers. When the hearing was through, the court, desiring to be fair and just to all parties and to condemn no man without affording him an opportunity to be heard, offered to allow either party to file additional affidavits, if they desired. If the state's testimony as to the character of petitioner's witnesses was not true, the attorney for petitioner should have availed himself of this opportunity to sus-

tain the character of his witnesses, but he replied that he did not desire to file additional affidavits.

In the case of *Hendrix v. State*, 4 Okla. Cr. 612, 113 Pac. 244, this court said:

"The illegal sale of intoxicating liquor, wrongfully and deliberately committed, is an immoral, degrading, and degraded act, and is committed only by the lawless and unreliable classes of our population. It is a matter of common notoriety that in nine cases out of ten the 'bootlegger' will not only not hesitate to commit perjury in his own behalf, but also he expects every man to whom he vends his stuff to commit perjury for him, should the occasion arise. The unlawful sale of intoxicating liquor involves moral turpitude, and shows a want of moral character."

Counsel must take notice of the published decisions of this court and are chargeable with such knowledge. With the Hendrix case before him, counsel for petitioner knew that a failure to sustain the character of his witnesses was a practical abandonment of his case. We are therefore forced to accept the testimony of respondent upon this question. An opportunity was given counsel for petitioner to file further affidavits. He declined to do so. We are therefore compelled to believe that he could not rebut the testimony of respondent upon this question. In addition to this, respondent filed a great many affidavits from citizens of Blaine county, denying *in toto* the charges made by petitioner. A number of persons who were on the witness stand and who filed affidavits in behalf of respondent are personally known to the members of this court as being among the most reputable citizens, not only of Blaine county, but also of the state of Oklahoma.

For the purpose of this decision, it is only necessary to copy in full the affidavit of Ex-Governor Ferguson, who justly enjoys the confidence and respect of all who know him, and whom we believe to be incapable of intentionally misstating any matter of fact. His affidavit is as follows:

"State of Oklahoma, Blaine County—ss.:

"I, T. B. Ferguson, being first duly sworn, say, that I am a resident of the town of Watonga, Blaine county, state of Oklahoma,

and have been most of the time since said town was opened for settlement; that I am especially familiar with conditions which existed in said town during the fall of 1910 and the spring of 1911; that during the fall of 1910 it was an open and notorious fact that there were from four to five places in said town where intoxicating liquors could be obtained in various quantities; that said parties who seemed to control these different places where intoxicating liquors were disposed of were, to the best of my be'ief, either protected, or at least overlooked, by the officers; that the community of Watonga and the law-abiding people of said community were incensed against such open and notorious violations; that the incoming officers who were elected at the election in November, 1910, had promised that they would, if elected, see that these violations were taken care of; that several arrests followed, after the taking of office by these officers, but the bootleggers and their friends seemed to have an ostensible showing of influence against the arrest and prosecution of what is commonly termed 'bootleggers,' and which is a misdemeanor charge (they would often, when attempted to be arrested, try to evade the officers, and did in various instances); that on the afternoon of the 14th day of March, A. D. 1911, S. E. Southerland, sheriff of said county, having in his possession a warrant for a misdemeanor charged, attempted to arrest one Joe Steils, for the violation of the prohibitory law; that the said Joe Steils was in a buggy in company with one Charlie Hawkins, at said time; that they attempted to and did run from said officer, driving said horse that was thereto hitched, at a dangerous and reckless speed, through the business streets of said town, in making their flight from said officer; that on one particular crossing of said town they ran into a pedestrain crossing said street and seriously injured her, in the presence of a large number of people, who immediately gathered and helped the officer arrest said defendant.

"That it was suggested at said time, by some person to this affiant at this time unknown, that they give their moral support to the officers in the enforcement of the law, and that they organize some sort of society showing that their moral support was in favor of the enforcement of the laws, duly enacted; that, pursuant to said suggestion, a meeting was called at the courthouse in the said town of Watonga; that a large number of inhabitants of said town, congregated at said meeting, and, after appointing a committee on constitution and by-laws, different members suggested

that a notice of some kind be given to the various persons who were knowingly violating the laws of the state; that it was the sense of the said meeting that they go as a body to these different places, heretofore suggested, and give them notice that the law would be enforced, and that their moral support was behind the officers; that said arrangements were made and G. W. Craven was named as spokesman; that George W. Ferguson had been in said meeting, and when the meeting adjourned to wait upon these different people the said George W. Ferguson told this affiant that they must be careful and see that no harsh or violent acts or language should be used or tolerated by said members in any way.

"That affiant knows of his own knowledge that the said George W. Ferguson did not make a speech at said meeting, or at any other time, to his knowledge, warning any person under suspicion; that all he said in substance was that the laws should be upheld; that I was present at the speech he made in said meeting, and that he did not say that a jury would be got that would stick all persons charged with the violation of the law; that at no time have I seen the said George W. Ferguson do or say anything that tended to show bias or prejudice for or against any persons accused of crime that was brought to this court.

"That, being a publisher of the Watonga Republican, I have on numerous occasions visited and been present when the court, presided over by the said George W. Ferguson, was in session, and that at all times he seemed to conduct said court in a fair and impartial manner.

"That at no time when said citizens so congregated together, and at a meeting which was called a 'Law and Order' meeting, and at which law and order meeting said visitation was made, did the said George W. Ferguson say anything, to my knowledge, nor was anything said by the spokesman, to tend to terrorize or intimidate any person called upon; that they were simply asked to desist from further violation of the law, and told that if they did not do so law and order would be enforced.

"That there were no unlawful acts by said citizens; that they were men of respectability and law-abiding citizens of the said town of Watonga; that no place or person were mentioned, other than those that were visited, nor any threats made, other than were executed, and that the whole idea and object of said

meeting and the warning of people to desist from the violation of law was for the purpose of showing violators of the law that the good citizenship of Watonga stood for law enforcement and the upholding of the officers in the discharge of their duties.

"T. B. FERGUSON,

"Subscribed and sworn to before me this ——— day of April, A. D. 1911. W. C. BURT,

"[Seal.] Clerk County Court."

This affidavit is in harmony with the oral evidence offered on the trial of this cause, and is a fair sample of the other affidavits filed by respondent. In fact some of these affidavits go more into details and state the conditions existing in Blaine county more strongly than they are stated by Governor Ferguson. At first it was feared that the woman who was run over as described by Governor Ferguson was fatally injured. We desire to commend the people of Blaine county for their self-control and regard for law and order, as is indicated by the fact that they did not execute summary vengeance at the time upon the man who drove his horse and buggy over this unoffending woman on the streets of Watonga.

We think that under the conditions proven to exit in Blaine county, and described in the affidavit of Governor Ferguson, the people of Blaine county not only had the right to organize in a lawful manner for the purpose of assisting the officers to enforce the law, but that it was their duty to do so. No reputable witness testified to any disorderly act committed by the people at this meeting. It was proven upon the trial of this cause that no threats of violence or profane language was used, and that no arms were carried by those who notified parties who were under suspicion that they must cease violating the law if they desired to remain in Blaine county, and that the good people of the county were going to support the officers of the law in an honest effort to enforce the law. We desire in this connection to say that all organizations having for their purpose the enforcement of law should exercise the greatest care to see that they them-

selves do not violate the law. The history of the Western states shows that in many instances such organizations have gone entirely too far, and have resulted in great disorder and bloodshed. We believe that the laws of Oklahoma, if properly enforced, afford ample means for punishing the guilty and thereby protecting society. We also believe that these laws can and will be properly enforced, when the people give the officers their moral support. We can see no lawful reason or excuse why any body of men should attempt to take the enforcement of the law into their hands. Neither is there any reason why the people should not organize to assist the officers in enforcing the laws.

One of the most useful organizations in the state is the Anti-Horse-Thief Association. The people have just as much right to organize to assist the officers to enforce the law against the bootlegger as they have to organize to assist the officers to enforce the law against the horse thief. Of the two, the horse thief is the least dangerous to the lives and character of the people, and the peace and good order of society. Who would say that, because a juror or judge may belong to or be in sympathy with the Anti-Horse-Thief Association, he would thereby be disqualified from taking part in the trial of a defendant charged with theft? The writer of this opinion was for years attorney for the Anti-Horse-Thief Association. He confesses to a strong prejudice against horse stealing, but he has no prejudice against any individual, simply because he may be charged with this offense, until such person has been proven to be guilty by competent evidence, beyond a reasonable doubt. On account of the infamous character of the crime, he would require conclusive proof of the guilt of a defendant before believing him to be guilty.

We also desire to say that it is best for judicial officers not to participate in public meetings in which questions are discussed which may afterwards come before them for decision. Their conduct in the courtroom during the trial of a case should let the public know their views with reference to the enforcement of law, and it is far better that they should abstain from giving

public oral expression to their views. A judge should never be a partisan. Whenever he becomes a partisan, his usefulness on the bench is greatly impaired, if not entirely destroyed.

He should never commit himself upon any question either of fact or law, which is liable to come before him, until the matter is properly presented in open court, and both parties have had equal and ample opportunity to be heard. We are therefore of the opinion that it would have been better if respondent had not participated in the public meeting which took place in Blaine county, Okla., and had not accompanied those who felt it to be their duty to warn persons who were under suspicion of having violated the law that if they desired to remain in Blaine county they must cease violating the law, and that the people were going to assist the officers in enforcing the law. But all the evidence for the respondent shows that no threats of violence were made by those who gave this warning, and that their conduct was quiet and orderly, and that their only purpose was to give warning to parties who were under suspicion. We cannot therefore hold that their conduct was illegal, and, although we believe that it would have been better if respondent had not gone with these parties, we cannot say that his presence indicated such a personal bias against the parties warned as would justify this court in holding that he was incompetent, on the ground of prejudice, from presiding at the trial of any person so warned. If the contention of counsel for petitioner is correct, no judge or jury should try a defendant who is charged with a crime who are themselves opposed to the commission of such crime; or, in other words, the idea of petitioner seems to be that the punishment of criminals should be intrusted to those who sympathize with criminals.

There is a great and manifest difference between prejudice against a crime and being prejudiced against a person who may be charged with the commission of such crime. Every good citizen is prejudiced against the commission of crime. If being prejudiced against the commission of crime is a disqualification, then the members of this court are disqualified to decide any case pend-

ing before them, for we have time and again in our opinions given notice and "fair warning" to lawless characters that they should leave the state, or obey the laws, if they desired to remain at liberty, and that it was our purpose to do all in our power to suppress crime in Oklahoma. Our views upon this matter were clearly expressed in the case of *Remer v. State*, 3 Okla. Cr. 709, 109 Pac. 249. Judge Richardson then a member of this court, who has no superior as an able, just, fearless, and learned judge, speaking for the court, there said:

"It alleged prejudice on the part of the jurors, not against the plaintiff in error, but only against the offense. We presume that if a defendant was charged with murder, then by the same token he would be entitled to a trial by a jury composed of men entirely indifferent as to whether murder be committed in their county or not; men who entertain no prejudice whatever against the crime of murder. It is generally thought that a juror should be a man, not only law-abiding himself, but imbued with a desire to see the laws in their entirety honestly and righteously enforced against all offenders; that the enforcement of the law is contemplated and intended, and that it will be enforced better by those in sympathy with it, and who recognize the necessity and justice of it, than by that class of persons who are indifferent, or who desire to violate it or thwart its administration. We had always heard that good citizens are prejudiced against any 'class of violations of law'; that good citizenship implies a respect for and an obedience to all laws, so long as they are laws, and a willingness and desire to see them effectively administered. And we are told here for the first time that a defendant has a vested and inalienable right to be tried by a jury who possesses no regard for the particular law alleged to have been violated, selected by commissioners on friendly terms with the particular offense charged. This may be so; but we have been cited to no authority therefor. We conjectured that plaintiff in error was claiming a constitutional right to a trial by a jury of his peers; but upon an examination of the Constitution we find no such provision therein; the Constitution guaranteeing to him only a 'trial by an impartial jury of the county.' And while we have not looked further for authority, yet we are reasonably certain that we could have found none if

we had looked, and more certain that we should not follow it if we found it."

If the views contended for by counsel for petitioner are correct, every man charged with crime should be tried by a judge and jury who are absolutely indifferent to the commission of crime. To this doctrine we cannot assent. If we were to sustain the petition for mandamus upon the testimony offered, in view of the uncontradicted testimony in this record as to the character of persons who have made affidavits in behalf of the petitioner, it would be equivalent to placing every judicial officer in the state at the mercy of criminals and their associates. This we cannot do. We are determined that justice shall be done, that fairness shall prevail, that truth shall be vindicated, and that the majesty and dignity of the law shall be upheld, as nearly as possible, in every case submitted to us for decision, let it shake or displease whomsoever it may. This is the high standard which we are doing all in our power to establish, by which all criminal cases must be tried in Oklahoma. We fully indorse the statement made by Hooker when he said:

"Of law no less can be acknowledged than that it has its seat in the bosom of God; its voice is the harmony of the universe; all things in Heaven and on earth do it reverence; the weakest feeling its protecting care, the mightiest not being exempt from its power."

This being our ideal, we are trying to place the practice of criminal law in Oklahoma upon a dignified and honorable basis. There is no good reason why it should not be as reputable as the trial of civil cases, and we are determined that in Oklahoma it shall be. The standard of professional honor must be as high in Oklahoma as it is in any other state of the Union. We will not be satisfied with or tolerate anything less.

In every volume of our published reports we have announced that lawyers should try their cases upon their actual merits, and should act with perfect fairness toward the courts and opposing counsel. We now go further and give "fair warning" that, if

there are any members of the profession in Oklahoma who are not disposed to heed this friendly admonition, they will consult their own interest by removing from the state, if they desire to escape disbarment proceedings and keep out of the penitentiary. No lawyer has any right to make a criminal out of himself, in order that he may succeed in the trial of any case. No lawyer will be permitted to enjoy any benefits arising from illegal or unfair conduct on his part, if we can possibly prevent it. We earnestly request all trial judges in the state to rigidly pursue the same course, it matters not who the attorneys may be. The trial judges cannot do the state and the profession a greater service than by aiding this court in putting a stop to unprofessional conduct upon the part of attorneys, and by assisting this court in ridding the state of such characters. This must be done before justice in its purity, can be administered. Some lawyers act as though they thought that because Oklahoma is a new state they can do as they please, and that any kind of conduct will be tolerated. In this they are greatly mistaken, as some of them will discover to their sorrow, if they do not heed our admonition. Lawyers should be held more strictly accountable for their conduct than any other class of people, for two reasons: First, their opportunities for wrongdoing are greater; second, they are the sworn officers of the courts, and are therefore under double obligation to act honorably with the courts and with all men. A tricky and dishonest lawyer is a most dangerous member of society, and he brings the profession of law into disrepute. Law is an honorable profession, and the most of the lawyers are honorable men, and it is the duty of the courts to protect society and the profession itself against unworthy men.

It is a waste of time and a useless expenditure of money for counsel to attempt to get this court to disqualify a judge upon such testimony as was produced upon this trial. We want every judge in Oklahoma to know that he can rely upon the support of this court so long as he acts fairly and within the duties and powers of his office. The writ of mandamus is therefore denied.

A number of other cases are before us, based upon the same

facts and affidavits used in this case. It is not necessary to write an opinion in each case, and the same order will be entered in all of these cases.

ARMSTRONG and DOYLE, JUDGES, concur.