# ALVA SIGHTS v. STATE.

No .A-2559.   Opinion Filed July 21. 1917.

(166 Pac. 459.)

1.   **WITNESSES—Cross-Examination—Antecedents.** It is permissble on cross-examination to inquire into the antecedents of a witness by showing his occupation, vocation, or manner of living, as a general rule. This character of examination, however, is permissible only when the facts sought to be elicited are pertinent to the issue, or have some material relation thereto.

.2.   **HOMICIDE—Assault with Intent to Kill—Instruction—Rights as Against Trespasser.** When the crime of assault with intent to kill is charged, and the proof discloses the fact that the difficulty occurred upon the premises occupied by the defendant, and that the prosecuting witness was a trespasser creating a disturbance, the trial court should give in his general charge a proper instruction explaining to the jury how far the person charged might lawfully go in ejecting the trespasser, under the circumstances disclosed, before he would become the aggressor under the law or lose the right of self-defense, and fix in a clear and positive manner the responsibility of the accused, based upon his intent at the time of engaging in the controversy, as well as at the time of the alleged assault.

3.   **TRIAL—Argument—Cross-Examination.** Unfair argument on the part of the prosecuting attorney, and the asking of questions in cross-examination calculated to prejudice the defendant, should not be indulged in. Fairness in the conduct of a criminal trial is absolutely essential to the proper administration of justice.

*Appeal from District Court, Custer County;*
*T. A. Edwards, Judge.*

Alva Sights was convicted of assault with intent to kill, and he appeals.   Reversed.

*Jas. M. Shackelford* and *A. J. Welch,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., for the State.

. ARMSTRONG, J.   The plaintiff in error, Alva Sights, was convicted in the district court of Custer county on a charge of assault with intent to kill, and his punishment fixed at two years' imprisonment in the state penitentiary.

The information charges Sights jointly with Ed Haggerty and H. B. Webber with assault with intent to kill Joe Sturgis, in Clinton, Custer county, Okla., on January 23, 1915.   Severance was asked, and Alva Sights was placed on trial.

The evidence discloses the following facts:   A number of persons were drinking around a livery barn belonging to Webber on the date of the shooting.   During the afternoon several of these parties, including Alva Sights, became intoxicated.   The prosecuting witness went to the barn of Webber and was ordered away.   Some words were passed and a shot was fired by Webber. Prosecuting witness, Sturgis, left the place, but came back about 8 or 9 o'clock and renewed the quarrel.   It seems that he had asked Webber for money which had been refused him, but that Webber had loaned John Dunn some money.   Upon Sturgis' return to the barn the second time Webber asked Ed Haggerty, who is also charged with this crime, to go out and keep him away, saying that he did not want any trouble.   It seems that Sights and Webber were partners in buying and selling cattle, and used the office at the livery stable for their office in the other business.   Haggerty was unable to persuade Sturgis to leave, and Webber asked Sights to go out and assist in getting him to go away, saying that he did not want to have any trouble and that if he came in there would probably be trouble.   Sights went out and

walked up to the parties and asked Sturgis to go away. A quarrel ensued between him and Sturgis. Sturgis said that he was unarmed and made no demonstration towards Sights. Sights and two or three other witnesses who were present say that he was armed, and that he was, in the act of drawing a pistol from his pocket when Sights reached over and jerked a pistol off the person of Haggerty and fired. A pistol was picked up by witness Dunn where Sturgis fell. The shot entered over the right hip and penetrated the body, coming out on the left side. The surgeon testified that the wound was a dangerous one, and that the condition of prosecuting witness was serious for several days; that an operation disclosed that the bullet had penetrated the bowels and that severe internal hemorrhages had occurred. The evidence further discloses that Ed Dunn operated a livery barn near by; that Sturgis was working for or "hanging out" around the Dunn barn; that there had been ill feeling between the parties for some time. The case of the state is not as strong as it might be.

The witnesses for defendant made a strong case of self-defense. On the question of guilt, however, the finding of the jury would be final if the issue had been properly submitted.

There are only three assignments of error that require discussion.

The first is based upon the proposition that the court erred in refusing counsel the right to impeach the prosecuting witness by examining into his antecedents, his business, and his associates. In this connection the record shows the following: .

"Q. Joe, how long have you lived in Clinton? A. Something like ten years; have been here ever since the

town started. Q. What have you been doing for a livelihood? By the County Attorney: Objected to as immaterial. By the Court: Sustained: By Counsel for Defendant: Save the exception. Q. Joe, this is not the first trouble you have been into with folks around Clinton is it? By the County Attorney: Objected to as immaterial and improper cross-examination. By the Court: Sustained. By Counsel for Defendant: Save the exception. Q. Some time within the last three years you were convicted of pointing a gun at some fellows down there, wasn't you? By County Attorney: Wait a minute; we object to that as improper cross-examination and immaterial. By the Court: Sustained. By Counsel for the Defendant: Save the exception. Q. Did you work around the bus barn? A. At what time? Q. Well, any time within the last two or three years? A. Yes, sir. Q. During that time you drank a good deal of whisky, didn't you? By County Attorney: Objected to as immaterial and improper cross-examination. By the Court: Sustained. By Counsel for Defendant: Exceptions. Q. Didn't you, during that time very frequently visit that family of niggers across the street from the bus barn, didn't you? By County Attorney: Objected to as immaterial. By the Court: Yes; that is wholly immaterial; don't pursue that line if that is all you have in view. By Counsel for Defendant: A man's conduct is always material. By the Court: Well, I will sustain the objection. By Counsel for Defendant: Well, I don't want to transgress the court's ruling, but we have a line of questions we want to ask, and if the court doesn't want it to go to the jury, I ask to exclude the jury for that purpose. By the Court: Well, I am going to exclude that line of testimony, and you have made your record sufficiently along that line. By Counsel for Defendant (Mr. Welch): Do you care to look at authorities on it? By the Court: No, I believe I know what the law is on that. By Counsel for Defendant (Mr. Shackelford): If your honor please, I want to ask him some questions about his associations and his general

conduct with his associates. By Counsel for Defendant (Mr. Welch) : Our authority for it, your honor, is a recent holding of the Criminal Court of Appeals. By the Court: I know what the holding is. I am excluding that line of testimony you are pursuing now. By Counsel for Defendant: Exceptions. Q. During the year or so before this shooting occurred wasn't you the common associate of bootleggers and prostitutes in and around Clinton? By the County Attorney: Wait a minute; don't answer; objected to as immaterial. By the Court: That line is immaterial, Mr. Shackelford; don't pursue it any further. You have made your record along that line if there is anything in it for you. By Mr. Shackelford: Exceptions to the ruling of the court. Now, without putting it in the record, will the court give me an opportunity at some time during the course of the trial when it is convenient to ask him some further questions along that line, for the purpose of going into the record? I don't care about taking time in the presence of the jury. By the Court: If you have anything further to ask him now that is material, you may do it; we will take the other up at the proper time. Q. Who was the woman that was living at your house, Joe, at the time this shooting occurred? By County Attorney: Objected to as immaterial. By the Court: Sustained. By Counsel for defendant: Save the exceptions. Q. Don't you know that woman's name? By the County Attorney: Objected to as immaterial. By the Court: Overruled. Answer 'Yes' or 'No' if you know. A. No, sir."

It is contended by counsel for plaintiff in error that, under the doctrine announced by this court in *Slater v. United States*, 1 Okla. Cr. 275, 98 Pac. 110, the examination they proposed was a proper one, and that it was reversible error for the court to refuse them an opportunity to go thoroughly into these propositions on cross-examination. In the brief counsel argue that they were entitled to inquire into the private acts and conduct.

of the witness without limitation. In addition to the Slater Case they cite and quote from *Musgraves v. State*, 3 Okla. Cr. 421, 106 Pac. 544; *Crawford v. Ferguson*, 5 Okla. Cr. 377, 115 Pac. 278, 45 L. R. A. (N. S.) 519; *Terry v. State*, 7 Okla. Cr. 430, 122 Pac. 559; *Fowler v. State*, 8 Okla. Cr. 130, 126 Pac. 831.

An examination of the Slater Case, however, discloses the fact that the question there determined by this court was the right of counsel to ask a witness whether or not he had been arrested on any criminal charge. The court said that this question should not be asked, but that counsel could ask if witness had ever been convicted of a felony or any other crime involving moral turpitude. Certain paragraphs in the opinion, however, contain the following:

"But it is attempted to justify the admission of this class of evidence upon the ground that it is always permissible to inquire into the antecedents of a witness, by showing his occupation, social connections, manner of living, and such matters. While we approve the principles referred to, we deny its application to the class of evidence now under consideration. The presumption of law is that every person, to a large extent, has the right and power of selecting his occupation, social connections, and manner of living. Being matters largely of his own choice, they indicate his true character, and he is therefore responsible for them, and they may be inquired into for the purpose of affecting his credibility; but those reasons do not apply to indictments, arrests, or imprisonment before conviction, for the obvious reason that they are not matters of choice, but are involuntary, so far as the witness is concerned."

This doctrine was reiterated in the other cases cited.

These cases, on account of the fact that no limitation was placed upon what was said by the court, have

been more or less misleading to trial courts, county attorneys, and members of the bar. In neither of the cases in which these discussions have arisen was the direct proposition here involved an issue. The doctrine announced is sound when confined to proper limits, but would be disastrous to the orderly administration of justice when given a broad and unlimited application.

In *Cannon v. Territory*, 1 Okla. Cr. 600, 99 Pac. 622, the principle involved in this discussion was directly raised and passed upon by this court. In that case, among other things, it is said:

"It was competent for the prosecution to cross-examine the witness as to her antecedents, vocation, character, and past conduct, and thus impair her credibility. This line of inquiry became important because, the court having permitted the witness to testify as to the conduct of the deceased towards her, all of the circumstances surrounding the case justified a full cross-examination as to her past conduct and character, and as to the past conduct and character of the witness May Baser, who was her associate in conducting said rooming house. There is no better method of sifting the conscience and testing the veracity and credibility of the witness than by cross-examination, and a witness can also be cross-examined as to specific acts tending to discredit her, when such facts are relevant to the issue."

A careful reading of the Cannon Case and the authorities cited point the way to the correct determination of this proposition. Counsel attempt to give the Slater Case and other cases relied on a construction or application which is entirely too broad and which was never intended. This character of examination is permissible only when the facts desired are pertinent to the issue on trial before the court, and not otherwise. A rule that

would permit the promiscuous and unlimited examination of a witness as to specific private conduct regardless of the relationship of the matter inquired about to the issue joined would result in unreasonable confusion and the clouding of the real issues in every lawsuit that is brought to trial. The law never contemplated this, and the opinions of this court have never gone so far. The examinations referred to in all the cases considered by this court contemplate an inquiry into those acts, associates, and particular conduct of the witness which have some pertinency to the controversy being heard, and which are calculated to shed light on the truth of the problem rather than to becloud it.

In *Castleberry v. State,* 10 Okla. Cr. 504, 139 Pac. 132, this proposition, being directly raised, was discussed fully, and the authorities reviewed at length. Among other things, it is said:

"The next assignment is that the court erred in admitting the testimony of Ruth Brady, upon her cross-examination, and in permitting the state to introduce in evidence a post card photograph of Ruth Brady and the defendant upon the cross-examination of said witness. Ruth, as a witness for the defendant, had testified that in February, 1912, she went to her home and had a conversation with the prosecutrix, and asked her who she thought her baby boy favored, and the prosecutrix said 'that she didn't know, but that she had a pretty good idea'; that she then asked her who was the father of her child, and that 'she said she didn't know who the father of her child was.' On cross-examination she stated that the defendant was her sweetheart. The state procured a photograph taken by Jack Kendrick, another witness for the defendant, and extended it to the witness; her further examination, taken from the transcript, being as follows: 'Q. Whose picture is that? A. It's ours; Tom and

me. Q. Yourself and Tom? A. Yes; don't it look like us? Q. This shows Tom and you, and Tom has got his hands upon your leg, and your dress pulled up, and his hands up there on your knee, hasn't he? (Objection that the same is not proper cross-examination. Overruled. and exception allowed.) Q. He has got his hands up there on your legs? A. Yes, sir. Q. You was out riding with Tom and permitted him to do you that way? A. Yes, sir. Q. That is a true picture of you and Tom? A. Yes, sir.' She further stated that the picture was taken by Jack Kendrick about three months before; that she left Hobart, her home, with the defendant,, and went to see the prosecutrix at Davison, because she just wanted to see if the baby favored Tom. The argument is made that: 'A person having their picture taken in possibly an immodest way, as this picture represents, could have nothing to do with the truth or untruthfulness of what such person may testify to upon the witness stand upon a matter disconnected with such act. And the admission of such testimony, and the exhibit of said indecent picture as evidence, as was allowed in this case, answered no fairly useful purpose on the trial. It only tended to embarrass the witness by exposing any act done by her in the infirmity of human nature, amid the temptations that beset life, and the obvious purpose and the undoubted effect of such course of examination in this case were to degrade and injure the witness in the estimation of the jury or injuriously affect their verdict against the defendant.'

"The evidence, if inadmissible, was, beyond doubt, highly prejudicial to the defendant. On the other hand, the evidence of the witness Ruth Brady, if believed, was very damaging to the state.

"It is well settled that in a criminal case a witness on cross-examination may be questioned as to his rela- tions and feelings of friendliness or hostility towards the defendant.

"In Underhill on Crim. Ev., sec. 221, it is said: Questions put to the witness for the purpose of ascer-

taining his relations, business, social, or otherwise, with the accused and his state of mind, whether hostile or friendly towards him, are unobjectionable.'

"In *Holly v. Commonwealth* (Ky.), 36 S. W. 532, a woman was introduced as a witness for the defendant. It was held that it was not error, for the purpose of showing her interest and probable bias, to allow her to testify on cross-examination that she and the defendant had been living together without being married.

"In *Smith v. State,* 143 Ind. 685, 42 N. E. 913, it was held that the state, on the cross-examination of a female who was a witness for the accused, could show her relations with him, as showing bias in his favor on the part of the witness.

"In *Martin v. State,* 125 Ala. 64, 28 South. 92, it was held that a witness for the defendant could be asked on cross-examination if she did not sustain illicit relations with the defendant.

"In *Sexton v. State,* 48 Tex. Cr. R. 497, 88 S. W. 348, a witness was permitted to be asked on cross-examination if she had not lived in adultery with defendant for five or six years. She answered in the affirmative. This was held to be proper cross-examination. The court says: 'It was relevant for the purpose of showing her bias and friendship and close relationship to the appellant, and her interest in testifying in his behalf, and consequently as touching her credibility.'

"In *State v. McGahay,* 3 N. D. 293, 55 N. W. 753, a witness for the defendant, over his objection, was permitted to be cross-examined at length as to her relations to and criminal intercourse with the defendant. The court says: 'The able counsel does not contend that it was improper to ask the witness on cross-examination as to her criminal relations with men generally as affecting her credit, but urges that such object could be equally well attained without specifically naming McGahey, and that the necessary effect of so naming him must have been to prejudice the jury against him. Admitting coun-

sel's conclusion, we are still of opinion that the line of cross-examination was proper. The state has the right to show the relations existing between the witness and the party at whose instance, and presumably in whose interest, she was testifying. It had the right to expose to the jury every motive and desire of the witness that might naturally and reasonably be supposed to produce that bias that would affect the character of her testimony.'

"The doctrine that a witness may be cross-examined as to matters going to credibility may be well regarded as an exception to the rule that cross-examination is to be confined to matters touched on in the examination in chief, and the limits within which either party may cross-examine upon matters not strictly relevant, but which affect the credibility of the witness, is largely within the discretion of the trial court, but the privilege of degradng a witness by proof of disreputable conduct, not connected with the facts on trial, is one so liable to abuse that it should be closely guarded and allowed only upon the exercise of sound judicial discretion, and then only to affect the credibility of the witness.

"The witness Ruth Brady testified on her cross-examination that she was the sweetheart of the defendant. Here we have a very powerful motive for testimony in his behalf. She identified and admitted the photograph which shows that witness, in the presence of a third person, permitted the defendant to take indecent liberties with her person. We think the entire evidence upon the cross-examination, including the photograph, was properly admitted, as showing the nature of the relations existing between the witness and the defendant, and that their relations were such as would create a bias on the part of the witness that might reasonably be supposed to affect her credibility, and the fact that such evidence would probably prejudice the defendant in the minds of the jury did not affect its admissibility."

The authorities cited and the discussion in the Castleberry Case indicate the reasonable bounds within which this character of examination should be confined. The trial court should be careful to limit the same to proper channels in order that the real issues in the case may not be overshadowed by immaterial and cumbersome examinations. The facts sought to be elicited should have some material relation to the controversy or shed some probative light on the relations of the parties. The only questions asked which were entitled to be answered in the examination complained of were contained in the questions relative to the conviction of the witness and what he had been doing for a livelihood, as tending to affect his credibility. The witness should have been allowed to answer the same by the court; otherwise the trial court appears to have followed the law.

The second proposition is based upon the fact that the court failed to give any instruction outlining to the jury the rights of the plaintiff in error to remonstrate with prosecuting witness, Sturgis, in an effort to get him to leave the premises, but left it for the jury to determine without any proper instruction whether the plaintiff in error provoked the difficulty or was the aggressor in the controversy. It is clear from the facts that Sturgis was a trespasser on the premises; that plaintiff in error was lawfully there and maintained a place of business there. It therefore became necessary for the court to define to the jury the exact rights of the plaintiff in error. A number of requested instructions called the court's specific attention to this fact. The jury should have been told, therefore, in a properly worded instruction, that if they found that the plaintiff in error maintained an office and place of business in the livery barn,

then and in that event he was in a place where he had a right to be, and that, if he walked out to where the prosecuting witness stood and ordered him to leave the premises, he was acting within his rights, and could not be held criminally liable unless the acts complained of were committed by him with the intent of provoking a difficulty to give him an excuse for taking the life of Sturgis. The prosecuting witness being a trespasser on the premises and at the time creating a disturbance, the plaintiff in error had a right to demand that he leave the same and desist in his boisterous and disturbing conduct. So, if a controversy arose and a fight ensued, which resulted in the shooting of the witness Sturgis, it became vital for this issue to be properly explained and submitted to the jury. The opinions of this court covering this question clearly define the duty of the court in this respect.

In *Dickinson v. State,* 3 Okla. Cr. 151, 104 Pac. 923, this question was directly raised and determined. Among other things, it is said:

"We believe, under the evidence as shown by the transcript, the court should have further instructed the jury in regard to defendant's right to defend against an unlawful trespass or intrusion upon the premises of the defendant; otherwise the jury might be disposed to regard his act of going to the place armed, and requesting the prosecutor to leave the premises, as placing him in the attitude of a wrongdoer; and, if his testimony is to be believed in this respect, he acted within his rights in the protection of his premises and his person.

"Section 233, Wilson's Rev. & Ann. St. 1903, provides: 'To use or * * * . attempt to offer to use force or violence upon or toward the person of another is not unlawful in the following cases: * * * Third.

When committed either by the party about to be injured, or by any other person in his aid or defense, in preventing or attempting to prevent an offense against his person, or any trespass or other unlawful interference with real or personal property in his lawful possession: provided the force or violence used is not more than sufficient to prevent such offense.'

"* * * The defendant had a right to go where. the parties were intruding upon his premises and ask them to leave; and, if they did not accede to his request, he had a legal right to expel them as trespassers therefrom, provided that in so doing he did not use more force or violence than was reasonably necessary to effect that purpose. The defendant testified that he carried the shotgun for his own protection, and not for the purpose of expelling the trespassers. He says he did this because the prosecuting witness, Wiebe, had the reputation of being a quarrelsome and dangerous man. Wiebe admits that he made a threatening demonstration, and that Mr. Pullan stopped him, and that defendant, then holding the gun by the barrel, drew it back as if to strike him as he was advancing upon him. Against this attempted assault the defendant had the right to defend his person, independent of the right of defense of his property. We are of the opinion that under all the circumstances of the case an instruction embodying the views hereinbefore expressed should have been given to the jury."

The doctrine controlling this class of cases is fully discussed in the case of *Swan v. State, ante,* p. 546, 165 Pac. 627. In that case it is said:

"The proof in this case discloses the fact that this homicide occurred upon the premises of the plaintiff in error; that the deceased was a trespasser in his pasture and driving stock into the same unlawfully; that the plaintiff in error had a right to be where he was; and that under the particular circumstances had a right to remonstrate with the deceased for turning the herd of cattle

into his premsies.  It was vital to his defense that the jury be instructed properly on this proposition.  To use the broad language of the court and leave out all question of the intent would practically be saying to the jury that, if the plaintiff in error, by word or act, started the harsh conversation shown, he had lost his right of self-defense.  There can be no question but that the plaintiff in error had a right to complain of Hodge for turning the cattle in on him and for being on the premises himself.  This controversy began with just such complaint having been made, and the rapid exchange of bitter remarks which followed merged into the homicide.  It therefore was necessary for the court to put the burden of this instruction upon the intent of the accused at the time and to protect him with a proper instruction explaining to the jury how far he might lawfully go under the circumstances before losing the right of self-defense."

See, also, the authorities cited in the opinion.

The third and last assignment of error is based upon the alleged misconduct of the county attorney in the cross-examination of witnesses and in the argument of the case to the jury.  Among other things complained of in the argument, the following is set forth:

"The defendant and his witnesses are a bunch of drunken outlaws from Clinton."  "There is not the slightest defense, but the same was deliberate perjury."  "Defendant had the opportunity and he and the witnesses have framed up a defense."  "The defendant had the opportunity and framed up with the witnesses for the state."

The court admonished counsel to confine his argument to proper channels and called the attention of the jury to the fact that his closing instructions to them defined the proper limits for argument of counsel.  The record does not disclose the entire argument of counsel, and a reading

of the same does not disclose the facts upon which the county attorney could properly base the suggestion his remarks indicated. The remarks were wholly improper, and no good purpose could be served by this character of argument. The county attorney has no right to say or insinuate in an argument to the jury that the defendant on trial has been guilty of bribing the witnesses for the state, or framing up a perjured defense with them, unless the facts developed at the trial have clearly disclosed such a condition, and in this case the record does not disclose that situation. It is of doubtful practice to engage in this character of argument, even though it develops that perjury was committed, and that reprehensible conduct on the part of the defendant has in fact occurred. Counsel may have had facts within his knowledge not disclosed by the record which prompted him to make these remarks, but in law, even if such was the case, the remarks would be unwarranted.

The judgment is reversed, and the cause remanded, with directions to grant a new trial.

DOYLE, P. J., and MATSON, J., concur.