STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JOHN
C. BUTTERWORTH, ROGER N. BALDWIN, GEORGE
CABRIZZA, BASIL EFFSA AND DAVID NITKIN, PLAIN-
TIFFS IN ERROR.

Argued February 7, 1928—Decided May 14, 1928.

For the plaintiffs in error, *Arthur T. Vanderbilt.*

For the defendant in error, *J. Vincent Barnitt,* prosecutor of the pleas.

The opinion of the court was delivered by

KALISCH, J. The plaintiffs in error were jointly indicted, tried and convicted at a special session of the Court of General Quarter Sessions of the Peace in and for the county of Passaic, on an indictment charging them with the offense of an unlawful assembly, the trial judge, by virtue of the statute, sitting without a jury.

Judgment having been passed upon the defendants, a writ of error was sued out of the Supreme Court, which tribunal affirmed the judgment, now before us for review.

The indictment charges that on the 6th day of October, 1924, the defendants with force and arms at Passaic, &c., together with divers other evil-disposed persons to the number of five hundred and more, to the jurors aforesaid unknown, unlawfully, routously, riotously and tumultously did assemble and gather together to the disturbance of the public peace, and being so unlawfully assembled and gathered together then and there unlawfully, routously, riotously and tumultously did make a great noise and disturbance and did then and there remain and continue together as aforesaid, for the space of one hour then next following, and being so then and there unlawfully assembled and gathered together as aforesaid, did then and there unlawfully, routously, riotously and tumultously make and utter great and loud noises and threatenings signifying, among other things, that the purpose and intent of the said defendants and their aforesaid associates whose names are to the jurors unknown as aforesaid, unlawfully, routously and riotously and tumultously to beat and assault and frighten and intimidate certain quiet and orderly persons then and there gathered and standing, passing or repassing in and upon the public streets of the said city of Paterson, and unlawfully, routously, riotously and tumultously assembled and gathered together to disturb the public peace and commit assault and battery upon the

police officers, patrolmen and officers of the police department of the said city of Paterson, and to break, injure, damage and destroy and wreck the city hall, a municipal and public building of the said city of Paterson, to the great terror and disturbance, not only of the citizens of the said state there being and residing, but of all others, the citizens of the said state passing and repassing in and along said public street and common highways there, contrary to the form of the statute, &c.

Section 215 of the Crimes act (2 *Comp. Stat.* 1910, p. 1811) provides: "Assaults, batteries, false imprisonments, riots, affrays, routs, unlawful assemblies, nuisances, cheats, deceits and all other offenses of an indictable nature at common law, and not provided for in or by this or some other act of the legislature, shall be misdemeanors and punished accordingly."

This section was embodied in the first codification of the Crimes act, adopted March 18th, 1796 (*Pat. L. of N. J., p.,* 220, § 68), which section has remained unaltered up to the present time. The legal effect of the section was to leave the common law intact as to what acts constituted an indictable offense of unlawful assembly.

The right of the people to meet in public places to discuss in an open and public manner all questions affecting their substantial welfare and to vent their grievances, to protest against oppression, economic or otherwise, and to petition for the amelioration of their condition, and to discuss the ways and means of attaining that end, were rights confirmed and guaranteed them by the magna charta, petition of right and the bill of rights, the mainstay of the British constitution and the bases of both our federal and state constitutions. Of course, it goes without saying this inestimable boon of liberty was to be enjoyed by the people in a peaceful and law-abiding manner.

Our federal constitution recognized this invaluable right of the people by declaring in article 1 of its amendments: "Congress shall make no law respecting and establishing of religion or prohibiting the free exercise thereof nor abridging the freedom of speech, or of the press; or of the right

of the people peacefully to assemble and petition the government for the redress of grievances."

Our state constitution, article 1, placitum 18, declares: "The people have the right to freely assemble together, to consult for the common good to make known their opinions to their representatives and petition for a redress of grievances."

These constitutional mandates, being in favor of the liberty of the people, must be given the most liberal and comprehensive construction. In order to accomplish this, in a satisfactory manner, we must pay due regard to what the common law of England was on the subject in hand before the adoption of our constitution. This vital fact was fully appreciated by the framers of our state constitution, and finds expression in article 10, placitum 1: "The common law and statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature." * * *

As has been previously indicated herein, the common law rule as to what acts shall constitute an unlawful assembly has not been altered or repealed by statute.

This situation, therefore, leaves two questions to be determined—firstly, what were the essential elements of an unlawful assembly at common law? secondly, do the facts elicited by the testimony establish the offense of unlawful assembly as charged in the indictment against the defendants?

Now, first, as to what was deemed to be an unlawful assembly at common law. This query seems to be satisfactorily answered by what was considered to be essential to be set forth in an indictment to charge the offense of unlawful assembly at common law. In the instant case the indictment is in the common law form. Its language clearly indicates the common law concept of what constituted an indictable unlawful assembly. It contains all the requisites of the common law offense of unlawful assembly. 2 *Chit. Crim. L.* 276, 277; *Crown Cir. Com.* 413, 414, 415; 2 *Whart. Prec. Indict. & Pl.* 855, 856, 857.

The result of a careful examination of the cases dealing with this particular branch of the criminal law may be tersely summed up as follows: At common law, any gathering to-

gether of three or more persons, with intent to disturb the
public peace, accompanied by some overt act or acts to effect
that intent, was an unlawful assembly.

The character of the overt acts essential to manifest this
intent was of various kinds, as is illustrated by the precedents
of indictments. Thus, for instance, if those gathering were
armed, or were conducting themselves in such a disorderly
manner as to give firm and courageous persons in the neigh-
borhood reasonable grounds to apprehend a breach of peace as
a result thereof, such gathering would be an unlawful assem-
bly.

In *Reg.* v. *Cunninghame, Graham & Burns,* 16 *Cox Cr.
Cas.,* Judge Charles, in charging the jury (at *p.* 427) said:
"Now, with regard to an unlawful assembly, what is an un-
lawful assembly? That has been laid down by the very high-
est authorities in these terms: An unlawful assembly is an
assembly of persons with the intention of carrying out any
common purpose, lawful or unlawful, in such a manner as to
give firm and courageous persons in the neighborhood of such
assembly ground to apprehend a breach of the peace in con-
sequence of it." 1 *Russ. Cr. & M. (Ed.* 1845—at *p.* 272)
says: "An unlawful assembly, according to the common
opinion, is a disturbance of the peace by persons barely as-
sembling together with an intention to do a thing, which, if
it were executed, would make them rioters, but neither ac-
tually executing it or making a motion towards its execution.
Mr. Serjeant Hawkins, however, thinks this much too narrow
an opinion, and that any meeting of great numbers of people
with such circumstances of terror as cannot but endanger the
public peace, and raise fears and jealousies among the king's
subjects, seems properly to be called an unlawful assembly.
As where great numbers complain of a common grievance
meet together, armed in a war-like manner in order to con-
sult together concerning the most proper means for the re-
covery of their interests; for no one can foresee what may
be the event of such an assembly. So, in recent cases, it has
been ruled that an assembly of great numbers of persons,
which from its general appearance and accompanying cir-
cumstances calculated to excite terror, alarm or consterna-

tion, is generally criminal and unlawful." And the learned author continues: "And it has been well laid down by a very learned judge that any meeting assembled under such circumstances as, according to the opinion of rational and firm men, are likely to produce danger to the tranquility and peace of the neighborhood, is an unlawful assembly; and in viewing this question the jury should take into their consideration the way in which the meetings were held, the hour at which they met and the language used by the persons assembled, by those who addressed them; and then consider whether firm and rational men, having their families and property there, would have reasonable ground to fear breach of the peace, as the alarm must not be merely such as would frighten any foolish or timid person, but must be such as would alarm persons of reasonable firmness and courage."

This statement, of what was considered at common law as essential ingredients of an indictable offense of unlawful assembly, signally illustrates the futility of· attempting for future guidance to adopt an inflexible definition of all circumstances and conditions which might arise in the course of human events. Each case largely and necessarily depends upon the object and character of the meeting, and whether or not the overt acts done by the participants therein, pursuant to a common understanding, are of such a nature as to inspire well-grounded fear in persons of reasonable firmness and courage of a riot, rout, affray or other breach of the public peace.

It is obvious that the effort to give a satisfactory definition of whåt is an unlawful assembly meets with the same disappointing result as does the attempt to formulate a definition which would embrace all phases of fraud. We must, therefore, glean from, the reported cases at common law what the facts and circumstances of each particular case were in order to learn what the common law conception of an indictable unlawful assembly was.

· In *Reg.* v. *Cunninghame et al., supra,* the prosecution arose out of the disturbances by an assembly of people in Trafalgar Square, one of the busiest centers in London. The meeting was of a more or less turbulent character, attracting

a great number of rough and other disorderly and idle persons, the presence of whom in and about the square and the surrounding thoroughfares caused danger to the public peace. There were clashes with the police and assaults being committed. Fifteen thousand people had gathered there, and, according to the evidence, there was much disorder, violence, assaults and threatening danger to life and property. In fact, in all the cases at common law, where the indictment was for unlawful assembly, it invariably appeared that there was riotous conduct, assaults, batteries and commission of acts which threatened danger to life and property.

The legal principle, however, to be extracted from the cases at common law, seems to be that in order to constitute the offense of unlawful assembly it must appear that there was a common intent of the persons assembled to attain a purpose, whether lawful or unlawful, by the commission of such acts of intimidation and disorder which are likely to produce danger to the tranquility and peace of the neighborhood, and have a natural tendency to inspire rational, firm and courageous persons in the neighborhood with well-grounded fear of serious breaches of the public peace.

Keeping in view the legal principle just enunciated, we now come to a consideration of its application to and bearing on the second question, viz.: Do the facts elicited by the testimony establish the offense of unlawful assembly, as charged in the indictment against the defendants?

It appears from the record that there was an industrial strike among workers in the silk mills of Paterson, which strike had been in progress since August 1st, 1924; that on the 5th day of October, 1924, between seven and eight o'clock in the evening, some two or three hundred persons had gathered in a public square, between the City Hall and Market street, known as City Hall Plaza. Some of those assembled were sitting upon benches and others walking about; that there were about twelve police officers stationed in and about the plaza; that many of the persons who had congregated there were recognized as strikers; that such persons who were standing in the plaza were kept moving by the police officers; that about seven-thirty o'clock in the evening a procession of

about thirty persons marched along Market street, in pairs, from the Market street headquarters of the Associated Silk Workers to the plaza, led by two young women bearing an American flag, and immediately behind walked the defendants, John C. Butterworth, Roger N. Baldwin and Ferris Dreeka. These were the only persons identified by witnesses of the state as having taken part in the procession. The procession proceeded along Market street to the City Hall Plaza, a distance of about a block and a half, and was followed by a number of spectators.

It seems that on October 3d, 1924, three days preceding the meeting at the City Hall Plaza, posters were distributed, and notices inserted in Paterson papers, advertising a meeting in Turn Hall on the evening of October 6th, 1924. The substance of the notice was, that there was to be a mass meeting to protest against alleged unlawful acts and supposed oppression of the police officers in excluding the strikers from Turn Hall and in preventing the continuance of their daily meetings therein. The holding of this proposed meeting the police authorities refused to allow. As a result, on the evening of October 6th, persons who assembled in front of Turn Hall were dispersed by the police.

It appears that Baldwin, one of the defendants, was at the Market street headquarters of the silk workers when he learned that the chief of police had forbidden the meeting to be held in Turn Hall, and thereupon concluded to attempt to hold a substituted meeting at the City Hall Plaza, which resulted in the procession of persons to the plaza as stated. About fifteen hundred to two thousand persons were gathered together in the plaza. The defendant Butterworth started to address the crowd, saying: "Fellow workers," whereupon he was interrupted by police officers, who asked if he had a permit to hold a public meeting at that time and place, to which inquiry he replied, "This is my permit," holding up a book in his hand, whereupon he was put under arrest, to which he made no resistance, but quietly submitted.

The police officer next made an attempt to wrest the flag from the two young women who had led the procession, which attempt raised a protest from among the crowd, but both

young women were put under arrest and each quietly submitted thereto. A police officer then read the Riot act, at which time the police force had augmented to about forty in number, and immediately began to disperse the crowd, and while so occupied they met with some opposition from four or five or more individuals standing in different parts of the plaza, and among them were the defendants, Effsa, Natale, Konzer and Nitkin, who for aught the record discloses were peaceful spectators.

There was no evidence that any weapons were brandished or displayed at any time, except sticks in the hands of the police officers, after the reading of the proclamation; nor was there any evidence that any person was alarmed or intimidated by the attempted meeting. The testimony, except that coming from two police officers, one of which had been on the police force only three or four months, and who testified he was in fear something might happen until the original ten or twelve police officers had been augmented to about forty.

There was also testimony of Officer Love to the effect that the crowd put him in fear. Neither of the officers related a single act or alarming circumstance done or created by any one of the defendants, or of any act threatening the public peace done by any of the persons assembled there, or which was of an unusual, boisterous or disorderly nature. The only incident referred to as tending to exhibit boisterous conduct was, that as the procession marched to the plaza some of the marchers brushed against the police, but whether this was intentional or not the record does not disclose.

It is rather startling to the most lively imagination that if this meeting was of such a turbulent and disorderly character as described in the indictment, unsupported as it is, however, by the proof, that out of forty policemen only two of them, and they without stating any facts reasonably supporting any ground for fear or alarm which would be entertained by a person of a firm and courageous mind, were seized with fear of a threatened outbreak and breach of the public peace. As has already been mentioned, no circumstances were proven which tended to reasonably indicate that there was not only a common purpose on part of the defendants to disturb

the public peace, but there was a well-founded threatened danger of a breach of the public peace.

The trend of the testimony was that the object of the meeting was to protest publicly against action taken by the police authorities which prevented the strikers from holding their meetings to vent their grievances in a public hall. The object of the meeting, therefore, was *per se* not an unlawful one, and an indictment for unlawful assembly could not properly be predicated upon the mere fact of holding the meeting in a public place. It was essential in order to constitute an offense of "unlawful assembly" that the meeting be held and conducted in such a manner as to reasonably create in the minds of firm and courageous persons a well-founded fear of threatening danger to the public peace. We find an utter absence of any such proof.

Again referring to one of the incidents, relied on by the state, as tending to show the unruliness and disorderly conduct of those who were interested and participated in the holding of the meeting and tending to seriously disturb the public peace, is, that while the procession was marching from their headquarters to the plaza, some of the paraders had brushed against the police, but this appears to have been of such a trivial nature that no notice was taken of it at the time of its happening. The procession was allowed to proceed, and it was only when the defendant Butterworth was about to address the meeting, and before he had any opportunity to state its purpose, the police interfered and took him into custody.

From the record before us we find nothing in the statement of the facts contained therein to have warranted the finding by the trial judge that the accused were guilty of the offense of unlawful assembly.

Judgment is reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, TRENCHARD, PARKER, MINTURN, KALISCH, KATZENBACH, CAMPBELL, VAN BUSKIRK, KAYS, HETFIELD, DEAR, JJ. 11.