**70 P.(2d) 902**

**STATE v. GENNIS.**

**No. 4272.**

Supreme Court of New Mexico.

**July 22, 1937.**

Nathaniel Lloyd, of Las Vegas, for appellant.

Frank H. Patton, Atty. Gen., and Fred J. Federici, Asst. Atty. Gen., for the State.

HUDSPETH, Chief Justice.

This is an appeal from a judgment and sentence of the district court after a jury had found appellant guilty of violating 1929 Comp.Stat. § 35-3201. The information states that appellant and 100 other persons did assemble together with intent then and there to do an unlawful act with force and violence against the property of the American Metal Company "by intimidation and threats to the employees of said Company to prevent the operation of the pumping system of the mine of said Company, thus and thereby causing or threatening to cause the destruction of the property of said American Metal Company." The property involved is situate on the upper reaches of the Pecos river and the underground workings of the mine extend under the river. In the early part of February, 1936, there were some 700 men employed in and about the mine and on the 12th day of that month in the early morning the appellant appeared at the collar of the shaft, with numerous other persons, and under his leadership it was resolved to prevent workmen from entering the mine and to bring the pump men out of the mine. The mine produced much water. It was testified by the foreman as follows:

"* * * In a little less than one hour the water would get so deep that the electric motors which drive the pumps would get wet and they would not work.

"Q. And what effect would that have on the mining operations there? A. It would stop.

"Q. And what effect would it have on the mine itself? A. It would eventually fill up with water and be lost. * * *"

Other witnesses testified that the appellant said "that they would go down and get the pump men that were at work, and let the mine flood, * * * that he would send a committee down to talk to Mr. Matson, and that it was his time to act, and if he didn't put the men back to work, I believe at that time, he had mentioned Andres Cruz and himself, that if they didn't come to their demands, why they would let it flood. * * *" and that they had formed a picket line to keep the men from going down in the shaft. When two of the pump men appeared at the collar of the shaft to go down to work, according to the testimony of Herbert

Hamilton, one of the pump men, the following occurred: "The Greek took me by the right arm and asked us where we were going, we told him we were going down, and he says, 'You are not going down, and nobody else is going down today.' * * *" The foreman of the mine testified: "I asked Gennis and Cruz once what would happen if we would put the pump men down anyway, and they said there would be trouble." Another witness testified: "Well, one time, Ole, the master mechanic, went and asked Cruz and Gennis to permit him to send lunches to his pump men who were left on duty. They refused and said that they would bring them out shortly anyway. I butted into the conversation and said that if the Mine drowned we would all be out of a job. Cruz said if we didn't get what we wanted, that is what we want to happen, and Gennis agreed, I believe he said, 'That's right.' * * *" A committee was appointed to get the men out of the mine. They phoned to the pump men in the mine and ordered them to shut down the pumps and come out. The foreman had the master mechanic cut off the power so that the appellant and his associates could not use the hoist in carrying out their threats to bring the pump men out of the mine. After the defendant and his associates had shut down the 12 mile aerial tramway between the mine and mill, the sheriff and other officers arrived and had to resort to the use of gas bombs in order to disperse the crowd of 150 or more about the shaft.

■ The evidence is sufficient to warrant conviction under the statute which is set out in State v. Hawks et al., 28 N.M. 486, 214 P. 753. See, also, 66 C.J. 39; People v. Most, 128 N.Y. 108, 27 N.E. 970, 972, 26 Am.St.Rep. 458; Annotation, 58 A.L.R. 744, 751. The Court of Appeals in the Most Case, speaking through Mr. Justice Andrews, said: "The main question relates to the sufficiency of the evidence to support the charge in the indictment. In order to ascertain in what the offense of an unlawful assembly consists, reference must be had primarily to the statute which defines it. It was an offense well know at common law, and common-law definitions are a material aid in many cases in the interpretation of statute definitions of common-law offenses. But as it is competent for the law-making power to create new offenses not before known, so it may extend to common-law definitions of particular offenses so as to include acts not punishable under the common law and not embraced within the common-law definition of the offense. In other words, identity in the name of offenses at common law and under a statute does not necessarily imply that the same precise constituents, and no others, enter into each. * * * Unless, therefore, the jury were authorized to find that the threat charged in the indictment was made not only by the defendant, Most, but also by at least two other persons, on the occasion in question, the offense was not made out. In determining whether others par-

ticipated with Most in the threat alleged, it was not necessary that it should affirmatively appear that other persons present uttered or repeated the same words used by Most. Their participation could be shown by their adoption of his language, exhibited by their conduct. If the jury were authorized to find that the persons present were under the influence of similar sentiments, and that they (to the number of two or more) adopted his language as their own, then the threats, although only uttered by him in words, were also those of the persons who by their conduct united in and assented to them. 'If any person,' said Mansfield, C.J. in Clifford v. Brandon, 2 Camp. 370, 'encourages, promotes, or takes part in riots, whether by words, signs, or gestures, or by wearing the badge or ensign of the rioters, he is himself to be considered a rioter.' Within this principle the requisite concurrence of the statutory number in the threats uttered by Most was shown or at least there was sufficient evidence of that fact to go to the jury."

Appellant maintains that the names of other persons, if they be necessary to the consummation of the offense, should, if known, be inserted, and if unknown the information should so state—that the information is fatally defective in that the only description of other persons is "together with one hundred (100) other persons," and cites State v. O'Donald, 1 McCord (S.C.) 532, 10 Am.Dec. 691. Trial Court Rule 35-4421 provides: "(4) In no case is it necessary to aver or prove that the true name of any person, group or association of persons, or any corporation is unknown to the grand jury or district attorney." See, also, Martin v. State, 115 Ga. 255, 41 S.E. 576.

The appellant also questions the soundness of an instruction given, but no objection was made in the lower court and the point cannot be raised for the first time in this court. State v. Sullinger, 36 N.M. 148, 9 P.(2d) 689; State v. Loveless, 39 N.M. 142, 42 P.(2d) 211.

The main point relied on for reversal is that the trial court denied appellant 24 hours after the delivery of a copy of the information before requiring him to plead, in violation of Trial Court Rule 35-4451; which reads as follows: *"Copy of indictment or information to be furnished defendant.* Every person who has been indicted or informed against for an offense shall be furnished with a copy of the indictment or information together with the indorsements thereon at least twenty-four hours before he is required to plead thereto, and he shall not be required to plead to such indictment or information if it has not been so furnished to him. A failure to furnish such copy shall not affect the validity of any subsequent proceeding against the defendant if he pleads to the indictment or information."

A complaint based upon the same offense had been filed months before and a copy of the complaint furnished another attorney who at that time represented the appellant. Trial of appellant was com-

menced after he announced ready on that complaint in cause No. 7023 on the criminal docket and a jury was impaneled, after which the case was dismissed, and the information in the case at bar, No. 7068, was filed. The record discloses the following:

"Thomas v. Truder (District Attorney): If the Court please, we now file an Information in this case.

"The Court: All right, let me have the Information. H. M. Genis, stand up.

"Clarence Lynch (Attorney for the Defendant): Your honor, please, we would like to have twenty-four hours time within which to plead in this case after the filing of the Information.

"The Court: The request will be denied. Mr. District Attorney, does this Information charge a different crime as in the Criminal Complaint?

"District Attorney: (Mr. Truder) No, sir.

"The Court: That being the case, I see no reason of any delay in this case of twenty-four hours.

"Mr. Lynch: In the former case, we did not have the time to present preliminary motions. We may have Motions we would like time in which to file, preliminary motions and pleas. * *

"The Court: Mr. Gennis, stand up. Mr. Gennis, there is an Information here against you, which reads as follows: (reads information) What do you say, guilty or not guilty?

"Mr. H. M. Gennis: Not guilty.

"The Court: All right. If you wish to file any plea, how long a time do you wish within which to file it?

"Mr. Lynch: We wish twenty-four hours. We would have to do some studying, and we—if this plea is in a form of former jeopardy, we may want to file a demurrer or some other pleading. * * *

"The Court: The record will show that the charge set out in No. 7023, and that set out in No. 7068 is the same only that in No. 7023, it is set out in the form of a Criminal Complaint, and in No. 7068 it is set out as an Information. * * * And the names of the same witnesses Mr. Truder endorsed in No. 7023, were endorsed on the Information in 7068.

"Mr. Truder: The other Complaint, being a Criminal Complaint, all of the same witnesses are not endorsed, part of them are the same."

The Attorney General, in an able brief, argues that under our liberal rules the information should be considered as an amendment or the stating of the same charge in a different form as that made in the complaint in cause No. 7023, and cites 16 C.J. 389; State v. Speyer, 194 Mo. 459, 91 S.W. 1075; State v. Sovern, 225 Mo. 580, 125 S.W. 769; People v. Kidd, 357 Ill. 133, 191 N.E. 244; Price v. People, 78 Colo. 223, 240 P. 688; White v. People, 79 Colo. 261, 245 P. 349; Potter v. State, 47 Okl.Cr. 254, 288 P. 362; State v. Bugg, 66 Kan. 668, 72 P. 236.

The criminal complaint filed in No. 7023 does not appear in this record, but we assume that the same charge under the same statute was attempted to be set out in both the complaint and information. The names of the witnesses indorsed upon the information were not the same as those on the complaint and the information was given a different number on the criminal docket.

By the adoption of trial court rules we eliminated many technicalities of procedure. However, in adopting these rules, most of which were taken from the Code proposed by the American Law·Institute, the matter of first consideration was that nothing should be taken away from the defendant essential to the effective presentation of his defense. In this spirit rule 35-4451 was adopted. It may at times be used by defendants to obtain unnecessary delay, but it was thought better to give defendants' counsel ample opportunity to prepare for trial and to take such steps preliminary to the plea as counsel may believe his client entitled to, than to permit a defendant to be hurried into a trial without preparation. The offense with which appellant is charged is closely akin to mob rule. One difference between the procedure of the mob and that of the courts is that the mob gives its victim no time to prepare for his defense, while courts endeavor by an investigation conducted with deliberation and impartiality to ascertain the truth.

· The impatience of the learned trial judge with defendant's demand for 24 hours' delay can easily be understood. He had been engaged for a week in the trial of other cases growing out of the same labor disturbances and had heard the State's witnesses give the same testimony repeatedly. Appellant's attorneys had represented other defendants. All concerned seemed familiar with the facts. However, this was a new cause, bearing a different number on the docket, and the information was a new pleading bearing the names of new witnesses. The appellant was entitled to the 24 hours demanded. 16 C.J. 389, 390; Bohannan v. State, 11 Okl.Cr. 69, 142 P. 1092; Dunkin v. State, 45 Okl.Cr. 203, 282 P. 692; State v. Jensen, 83 Utah, 452, 30 P.(2d) 203; State v. DeWolfe, 29 Mont. 415, 74 P. 1084.

The Attorney General argues that since the appellant entered a plea he is estopped from further ·objecting under the last clause of rule 35-4451, which says: "A failure to furnish such copy shall not affect the validity of any subsequent proceeding against the defendant if he pleads to the indictment or information." We are unable to concur in this view. Of course a defendant may waive his right to be furnished with a copy of the information, and if he fails to demand the 24 hours' delay the validity of subsequent proceedings could not be questioned on that ground. But appellant made his demand repeatedly and invoked the ruling of the court thereon. The court denied him a right guaranteed him by the rule.

For the reason stated, the judgment should be reversed and the cause remanded

to the district court with directions to grant appellant a new trial.

It is so ordered.

SADLER, BICKLEY, BRICE, and ZINN, JJ., concur.