210 P.2d 620

**STATE v. MARTINEZ.**

No. 5198.

Supreme Court of New Mexico.

Oct. 13, 1949.

E. Forrest Sanders, Las Cruces, Robert J. Barrett, Lordsburg, for appellant.

William R. Federici, Sp. Asst. Atty. Gen., Santa Fe, for appellee.

SADLER, Justice.

The defendant was convicted of voluntary manslaughter and sentenced accordingly, from which judgment and sentence he prosecutes this appeal.

In the early morning hours of February 12, 1948, about 1:30 o'clock, Robert Buck, the deceased, accompanied by two companions, Quinten Hulse and Charles Holman, 27, 22 and 20 years of age, respectively, entered the bar owned and conducted by the defendant, Ben Martinez, in the Village of Bayard in Grant County, New Mexico, for the purpose of ordering drinks. Upon entering the bar they found it somewhat crowded by patrons approximately twenty five (25) in number, all of Spanish-American extraction, who were loafing, drinking and talking with each other. Drinks were being served upon order by the defendant and his bar maid, Agnes Padilla.

The two younger men of the party had chanced upon each other at 5 o'clock the afternoon before and were joined by Buck, the third member of the party, about eight o'clock. After visting several bars and remaining in each for varied and indefinite periods, at least one by Holman and Hulse alone, and about three following the meeting with Buck, at one of which the party ate their evening meal, they came to a saloon known as "Ben's Bar," owned and operated by the defendant, later to become the scene of the shooting. It was an established fact that the three young men had imbibed freely of intoxicating beverages before reaching this bar. The two younger men were drinking beer and the eldest, the deceased, taking mixed drinks, —whiskey and water. The estimate of the number of drinks consumed by members of the party between the late afternoon before and the hour of entering Ben's Bar, nearly eight hours later, was from 8 to 10, each. While all naturally were under the influence of intoxicants, the extent was not established with any degree of certainty and, no doubt, varied as to each.

Upon entering Ben's Bar, Buck proceeded to the bar and Hulse paused and began talking to "a couple of fellows there at the table that started hallooing" at the Buck party as soon as they entered the bar. Holman stopped and observed that one of the two who had hailed them had picked up a chair in each hand and commenced bouncing them around on the floor. Holman stepped over to him and warned that he had better put the chairs down or he might hurt somebody. The next thing Holman knew they were down on the floor wrestling and fighting with the man bouncing the chairs on top when later separated. While still on the floor engaged in this scuffle near the bar the defendant, leaning over the bar, endeavored

to strike one or both of the participants with a long green bottle held in his hand by the neck.

During the struggle between Holman and the other person, later identified as a soldier named Ballesteros, home on furlough, Buck picked up a coke and beer bottle and struck the edge of the bar with their necks, breaking them. It was at this point that Agnes Padilla called John Turney, a deputy sheriff, who acted as policeman for Bayard, and asked him to come over, stating there was trouble in Ben's Bar. When Deputy Turney arrived for whom a second call had been put in while he was enroute to Ben's Bar, broken pieces of glass, as if from the bottles broken on the edge of the bar, were scattered around over the floor of the bar.

While the fight was in progress, the defendant had told the participants to break it up and get out. Buck asked why they could not be served drinks. Some one, apparently a customer, responded: "This is a Mexican joint, you can't have a drink here". A member of Buck's party said, "all right, we will go next door". There was another bar next door. The three members of the party then started out. Hulse was in the lead, followed by Buck and Holman. As they neared the door, they were rushed by a group of those in the bar and shoved through it, the defendant, who was participating in the expulsion, striking Buck on the head with a black

jack as his party was being expelled. The door was then "slammed shut" after them, thereby engaging the automatic lock and denying reentry to those outside.

The blow from the black jack had apparently dazed Buck and upon coming out of his dazed condition and realizing he had been struck, he turned and called upon those inside to let him reenter, applying an opprobrious epithet to whichever one had struck him. Enraged, seemingly, at his inability to get in and at his unknown assailant, he then struck violently with his closed fist the glass panel in the locked door breaking a large hole in it. The panel had dimensions of 2½ feet 3 inches by 2 feet and the breaking exposed the interior of the bar. As soon as this occurred Holman said, "Let's get going befor somebody gets hurt". Hulse then began pulling Buck back away from the door and toward the car and had gotten him practically to the door of Holman's car, parked some 10 to 12 feet away at the curb and across the sidewalk from the front of the bar, when the shot next mentioned rang out. In the meantime the defendant, who had returned to his place behind the bar, took a 38 caliber pistol from a drawer under it and fired a single shot through the opening made by the broken panel in the door. All three members of the Buck party entered the car as hastily as possible and were driven post haste to Fort Bayard Hospital by Holman, owner of the car.

It was found upon examination that Buck had suffered a gunshot wound from a bullet which entered his body just below the clavicle, or collar bone, on his right side, making its exit some four (4) inches lower than the point of entrance. In other words, the bullet entered deceased's body just below the collar bone on the right side and came out right above the lower part of the shoulder blade. It perforated the right axillary artery and vein and although an emergency operation was performed within twenty four hours following the shooting, it was to no avail. The deceased died from the gunshot wound shortly after midnight of February 14th.

It was also found that Quinten Hulse had been wounded by the same shot which passed through the body of the deceased, Buck. As already indicated, he was directly behind and facing the rear of Buck's body pulling him back towards the car to which point he had brought him, when defendant fired the fatal shot. The bullet, as it made its exit from the body of Buck, entered the body of Hulse at the relative location borne by his body to that of Buck, standing directly behind and facing the latter's body. It was still maintaining its downward course when it entered Hulse's body and continued to do so until it came to rest in his body. Hulse was not mortally wounded and in due season recovered.

The party of three, Buck, Hulse and Holman, had already left the scene of the shooting when Deputy Turney arrived. At that time it was not known by the defendant whether the shot fired by him had struck any one. The officer examined the pistol and found the chamber containing five shells, four loaded and one empty. The defendant admitted to the officer that he had fired the shell found empty in the pistol, which he had taken from a drawer in his bar about a minute and a half after the panel in the door was broken, upon returning to his place behind the bar. He also admitted that following the expulsion of Buck, Hulse and Holman, the door was closed by Gavino Navarro and that it locked automatically. In this connection, the defendant testified:

"A. * * * when we throwed them out, Gavino Navarro, he closed the door.

"Q. Did he lock the door? A. Yes, sir, it is an automatic lock."

Certain additional facts should perhaps be stated. As indicated by the course of the bullet in deceased's body, the fatal shot was fired from an elevation above its point of entry into his body. This is explained by the fact that the floor of the bar upon which defendant stood when firing was 2½ to 3 feet higher than the ground occupied by Buck and his party outside and across the sidewalk from the front of the bar.

None of the members of Buck's party was armed on the occasion in question. And it can be stated as a fact that soon

after they entered Ben's Bar on such occasion, a flare-up of racial feeling and prejudice, common to both groups, began to manifest itself.

The foregoing facts are well within the verdict rendered, either based on direct evidence before the jury, or permissible inferences arising therefrom. Upon them, after instructions from the court, the jury deliberated and returned its verdict finding the defendant guilty of voluntary manslaughter. He seeks a reversal of the sentence imposed upon him, assigning errors which will be considered and disposed of in the order presented. Although numerous errors are assigned they are argued under two propositions or points.

First, it is claimed the trial court erred in failing to sustain defendant's motion for directed verdict interposed at close of state's case in chief and renewed when all the evidence was in. In so far as the grounds of such motion relate to first and second degree murder, no discussion is necessary since the defendant was acquitted of each degree. But it is argued a verdict of acquittal should have been directed because immediately prior to the shooting the deceased, Buck, had feloniously and unlawfully destroyed a portion of defendant's building in violation of 1941 Comp. § 41-1218. The destruction mentioned refers, of course, to the act of Buck in breaking out with his bare fist the glass panel in the door of the bar upon realizing, after

coming out of a dazed condition from a blow on the head by a black jack wielded by defendant that his assailant had closed and locked the door to prevent his reentry.

The statute relates to unlawful assembly and reads: "If any of the persons unlawfully assembled, shall demolish, pull down, or destroy any dwelling-house, or any other building or shop, he shall be punished by imprisonment in the state penitentiary for not more than seven (7) years nor less than three (3) years."

It follows 1941 Comp. § 41-1210, enacted originally as a part of the same statute (L. 1853–1854, c. 7, §§ 126–130) which defined unlawful assemblies, as follows: "If three (3) or more persons shall assemble together, with intent to do any unlawful act with force and violence against the person or property of another, or to do any unlawful act against the peace, or being lawfully assembled, and shall agree with each other to do any unlawful act, as aforesaid, and shall make any movement or preparation therefor, the persons so offending shall each, on conviction thereof, be fined in any sum not exceeding two hundred dollars ($200), or be imprisoned not exceeding six (6) months, or both, at the discretion of the court in which the conviction is had."

Laying aside for purposes of this case, consideration of whether the breaking of a single panel in the door of a building

would amount to the "demolition, pulling down, or destruction" of any dwelling house, or any other building or shop within the true meaning of the statute, it should first be ascertained whether there was any proof of an unlawful assembly before the statute can have any application at all. No felony can arise under this statute in any circumstances except there be an unlawful assembly. In order to constitute the offense of unlawful assembly, three or more persons, gathered together, must share a common intent or purpose to do an unlawful act against the person or property of another, or to commit some act proscribed by the statute defining the offense. State v. Hawks, 28 N.M. 486, 214 P. 753; State v. Gennis, 41 N.M. 453, 70 P.2d 902; State v. Butterworth, 104 N.J.L. 579, 142 A. 57, 58 A.L.R. 744, with annotation at 751, supplemented in 93 A.L.R. 737.

A review of the whole record fails to disclose any evidence that would have warranted a finding by the jury that the three members of Buck's party who entered Ben's Bar to order drinks were acting in concert or in pursuance of a common intent to do an unlawful act against the person or property of another. After entering the bar, one of their number was accosted in a threatening manner by some member of the group inside with whom a fight immediately started. They were separated and their party was asked to leave which they were in the act of doing when rushed by several of the group inside. The deceased, Buck, was assaulted with a black jack just as they were shoved out of the building and the door slammed shut after them. Certainly, Buck's act in breaking the glass panel with his fist, on coming out of the dazed condition occasioned by the blow on the head from the black jack, bore no earmark of action in pursuance of a common design. Rather, it obviously was a spontaneous act on his part, done impulsively in anger and chagrin upon realizing the nature of the assault upon him. Although operating against rather than in favor of the defendants in State v. Hawks, supra, what is there said may well be applied in favor of the present verdict to the defendant's argument on the question of unlawful assembly. The court said [28 N.M. 486, 214 P. 754]: "Counsel for the appellants present a single proposition and that is that there was no substantial evidence before the jury upon which the verdict could be based. The argument proceeds, apparently, that the testimony of the appellants and their witnesses is to be believed rather than that of the prosecution."

So it is here. Counsel would have us accept the version of defendant and his witnesses on what transpired rather than that of the witnesses for the state. On the contrary, we should view the testimony as a whole in the light most favorable to the state, resolving conflicts therein and

indulging all permissible inferences, in favor of the verdict. City of Roswell v. Hall, 45 N.M. 116, 112 P.2d 505.

It is also claimed the request for directed verdict should have been granted because the killing took place during the suppression of a riot as defined in 1941 Comp. § 41-1210, quoted above, and, hence was justifiable. It had been disclosed in evidence that the defendant held what was designated as a courtesy commission as deputy sheriff. However, according to his own testimony he was not on duty that night as a deputy sheriff and his possession of the gun at the moment was for his own protection. Nevertheless, it was sought to invoke justification on the ground that the killing occurred while defendant was engaged in the suppression of a riot as described in said section 41-1210.

There are two answers to the claim. First, as already shown, there was no evidence that Buck and his two companions were unlawfully assembled. In the second place, even if they had been, the offense described in the statute relied on is a misdemeanor only—not a felony. The maximum punishment is a fine not to exceed two hundred ($200) dollars, or imprisonment not to exceed (6) months, or both, at the discretion of the court. Certainly, an accused may not under it, even though the holder of a commission as deputy sheriff, avail himself of the justification accruing to an officer for the killing of another found in the commission of a felony.

Nor can counsel find support for their claim of error on the trial court's part in denying the request for a directed verdict, interposed when the state rested and as well at the close of the entire case, from the holding of this court in State v. Couch, 52 N.M. 127, 193 P.2d 405. The verdict of the jury forecloses any basis for claimed error in this respect. Paragraph 31 of the court's instructions to the jury reads:

"Sec. 41-2413 of the New Mexico Statutes Annotated provides among other things: 'Killing in defense of person or property,—Such homicide is also justifiable when committed by any person in either of the following cases:

" 'First: When resisting any attempt to commit any felony upon him or her, or upon or in any dwelling house in which such person shall be.

" 'Second: When committed in the lawful defense of such person, or his or her husband, wife, parent, brother, child, master, mistress, or servant, when there shall be reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished; * * *.'

"If you find that at the time of the homicide, the defendant was acting in any

of the manners set forth in said Sec. 41-2413, then the homicide is justifiable and your verdict must be for the defendant."

■ Thus it is that even if the factual situation here present warranted consideration of the doctrine of the Couch case, as it does not, the jury's verdict was against the defendant on the issue. Possibly the jury could see a difference between an assault on one's home, or "habitation," and an assault on a saloon on the first floor of a building, the second story of which was occupied as a home, accessible through a rear entrance apart from the saloon. Whatever the considerations moving it, the jury found there was no such assault as the statute involved contemplates. True enough, the trial court omitted from this instruction the third sub-paragraph of § 41-2413, reading: "Third: When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed; or lawfully suppressing any riot; or in lawfully keeping and preserving the peace." However, since no riot was in progress and the defendant was not acting as a peace officer, the trial court correctly eliminated that portion of the statute in question.

■ Under a point designated by defendant's counsel as "Proposition No. 2," they argue error in the trial court's failure to give certain requested instructions presented by them, especially on the issue of self-defense. Careful study of the denied instructions and those given satisfies us there was no error in this connection. As to some of the requests, what has been said in disposing of the grounds relied on for directed verdict of acquittal, especially requests relating to unlawful assembly, is adequate treatment. Still others have no basis whatever in the evidence and in so far as any do, the issues presented by the requests are sufficiently covered by the instructions given.

■ Finally, it is claimed as a ground of the motion for new trial that the court erred in declining to sustain defendant's motion for mistrial based on the district attorney's argument to the jury. The proceedings in relation to this objection took the following form, to-wit:

"Mr. Sanders: 'Comes now the defendant, Ben Martinez, and respectfully moves the Court to enter a mistrial on the ground that the Assistant District Attorney, J. R. Wrinkle, made a statement in argument that one of the defense witnesses, whom he recalled to be Gavino Navarro, testified that Martinez said, "Stand aside, I am going to shoot." As a ground for said motion, defendant alleges and states that the record of testimony in this cause was duly challenged and, after an examination of said record, the same fails to substantiate the statement as made by said Assistant District Attorney and that said statement as made is prejudicial to the rights of said de-

fendant, and the jury may be unduly biased, inflamed and prejudiced thereby against said defendant.'

"(Argument)

"The Court: Overruled.

"Mr. Sanders: Exception.

"(The Court further instructed the jury in the courtroom)

"The Court: I wish to call the attention of the jury to the specific instructions, No. 38: 'The arguments of counsel are not evidence, nor are they to be taken by you as correct statements of law, if contrary to that which is given you by the Court. You are to depend for the evidence upon your memories, and not upon the statements of counsel', and the first part of No. 40: 'And in deciding this case, you should not consider as evidence the statements of counsel in your presence.'"

There was no error in the trial court's action. The defendant gambled all on the claim to a mistrial. It is argued by counsel for the state that the only way in which defendant could have been prejudiced by this erroneous statement of the evidence would have been on the issue of premeditation, a factor eliminated by defendant's acquittal of murder through his conviction of manslaughter. Whatever the merit to the argument, we do not choose to rest our ruling on this consideration. Counsel made no request short of demand for mistrial.

They asked for no reprimand of the assistant district attorney. Nor did they ask that the jury be instructed the testimony had been misquoted and accordingly admonished to ignore the same.

As a matter of fact, other witnesses than the one named in the objection quoted defendant as giving the "Stand aside" order, some without quoting him as adding a reason for the command, namely, "because they are liable to hit us with a rock." The trial court may very well have felt the evidence would support a finding that the actual reason for the order was as quoted by the assistant district attorney. But it was the jury's province, not his, to draw that inference. And, having been shown by the record that the witness named by the assistant district attorney, or any other if so shown, had not been quoted as adding the language "I am going to shoot," to his command to "Stand aside," the trial court upon request by defendant should, and no doubt would, have admonished to ignore and give no effect whatever to this misstatement of the evidence. Indeed, the trial court might very well have given such an admonitory instruction on its own motion. Whether the trial judge was himself in some doubt on the state of the testimony on the challenged statement, or was dealing strictly with counsel in the matter of making objections, we are unprepared to say. State v. Hernandez, 36 N.M. 35, 7 P.

2d 930. We are convinced, however, reversible error is not shown.

The judgment will be affirmed and it is so ordered.

BRICE, C. J., and LUJAN, McGHEE and COMPTON, JJ., concur.