Oscar LAIR, Gordon Bryant, and C. B. Horton, Plaintiffs in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12431.

Criminal Court of Appeals of Oklahoma.

Sept. 19, 1957.

**228** ■ ■

Frank Grayson, Oklahoma City, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, Presiding Judge.

Plaintiffs in error, Oscar Lair, Gordon Bryant, and C. B. Horton, and one Bill Turner, were charged in the Court of Common Pleas of Oklahoma county, by information with the offense of unlawful assembly, 21 O.S.1951 § 1314. Turner was granted a severance and only Lair, Bryant, and Horton were tried. They were tried by a jury, convicted, but the jury was unable to agree on the punishment and left the same to be set by the trial court who fixed the same at a fine of $500 each. Judgment and sentence were entered accordingly, from which this appeal has been perfected.

It is important that a digest of the evidence be delineated. The record discloses, as developed by the State, that Fritz Black, State's witness, testified that he and Gordon Bryant, striking members of the Teamsters Union Local 886, Oklahoma City, had been checking various picket line situations. Returning to the union hall by way of N. W. 36th and May Avenue, crossing 19th street, they observed, in the 3000 block, furniture being loaded into a Mayflower Transit Co. truck. The Oklahoma City agent of Mayflower Transit Co., Reliable Van Lines, was one of eleven companies on strike. Believing this operation might be in violation of the Teamsters strike by some of their own members, they returned to the union hall and there reported the situation. There, according to Black, they told Turner and Horton what they had observed. They, Black and Bryant, decided to go back out and check on the operation to see if it was any of the Teamsters Union members. Black testified they did not know if Horton and Turner were coming out to observe the operation. On arrival, they observed the loading operation from their car. He further related that at no time did he or Bryant discuss what they would do about the situation. He testified Bryant, talked to the Mayflower driver for a time, by himself, before Horton and Turner arrived. Bryant and Oden, the driver, went around to the truck cab, both finally returning smil-

ing, he said. Shortly after they arrived on the scene, Horton and Turner came out while Bryant was talking to Oden. All that time, he said, Turner, Horton, and himself were in the front of his car, about twenty feet from the back end of the truck.

No officer of the union was at the hall when they left, but shortly after they arrived at the scene and were talking to the driver of the truck, Oscar Lair, the Vice-President of the union, came in response to a call from Mr. Oden, driver of the Mayflower truck. Mr. Lair arrived about the same time as Horton and Turner, he said. Black testified that he heard no threats made by anyone and that there were no weapons or instruments of violence at the scene.

Mrs. McClain, the party being moved by the Mayflower truck, testified that she and her son were at her residence, where the union men told her why they were there. She. said they stated they were on strike and they resented the driver moving her because it was in infringement on their rights for him to do so. They gave her the names of several other companies who could move her. She went back into the house to call them and finally some policemen came out in response to Mr. Oden's call, after he had called his place of business in Pauls Valley, Oklahoma. Mrs. McClain further testified she heard no threats in her presence and the police arrested no one. She stated no weapons of any kind were seen by her at any time. She testified in response to the question, "The whole thing upset you?", "Slightly." When she first saw the union men, five of them were there. The record shows that she had been at a neighbor's visiting for at least thirty minutes during which time the union men had arrived and she did not know when they came, and whether singly or as a group. She testified that they had a police escort out of town and a patrol escort to Pauls Valley. But, she did not testify to any facts as to why such escort was necessary. On this point, the record is a matter of surmise.

The Mayflower driver, Mr. Oden, testified that he was driving the truck for Mrs. Collier's Transfer Company located in Pauls Valley, Oklahoma. Mrs. Collier's Transfer Company was the agency for the Mayflower Transit Company in Pauls Valley. He said the contract with Mrs. McClain originated in Pauls Valley and that he had gone to Mrs. McClain's home in Oklahoma City to move her to Pauls Valley. He testified his truck had a Mayflower design on it. He testified further that he had his wife and a helper with him. His evidence disclosed the truck was, parked in the street parallel with the curb on the east side of the house. The car of one of the union men was parked about twenty feet behind the truck and the other one in front of the truck, he related. He was loading the truck and some men came and told him to stop. He said as far as he knew, there were five of them. (Apparently, these referred to were Bryant, Black, Horton, Turner, and a Mr. Streeter. The latter arrived sometime after Black and Bryant, but apparently before Lair.) He did not remember just what was said, except, "Anyhow, they accused me of breaking the strike. *One of the five men—* I wouldn't swear which one. *I believe it was two men I talked to.*" He did not definitely recall which one accused him of breaking the strike. But, he was informed that Mayflower Movers were on a strike in Oklahoma City. He tried to reason with the man to whom he was talking; that he was not affected by the strike since it was a haul from Oklahoma City to Pauls Valley. He testified he offered to show *this person* his bill of lading and told him he was not union and his company was not on strike. He identified Bryant as this man and the one who told him that he, Oden, "would get a busted head and my truck turned over." He said he might have said something else but he did not remember what it was. He testified he called his wife, his helper, and Mrs. McClain and asked Bryant the question, "What they would do to me if I did go ahead and load." He said Bryant said he would not do anything,

**230**

but to go ahead and load. He is not corroborated in this by Mrs. McClain or by anyone else. If this were true, it should have been corroborated.

The record clearly supports the conclusion that this threat was made out of the presence and hearing of the other four union men and not while Lair was present. In fact, if the threat were made, it was made while Bryant and Oden were in the cab of the truck examining the bill of lading, and the four other men, if four were present at that time, were in front of the car parked at the back of the truck. This evidence is unrefuted.

Oden testified further that threats were made neither by defendants Lair or Horton, nor by Turner, who was not on trial. In fact, Mr. Bryant was the only man who threatened him. On this point, Police Officer Stevenson testified Oden told him that somebody threatened him but he did not identify the one who did. It is well to note also at this point that Mr. Lair testified that Oden told him that someone had threatened him. Oden testified that he had a police escort out of town, and a patrol escort to Pauls Valley, but he gave no reason therefor other than the hereinbefore related threat of Bryant. He was asked if he proceeded to Pauls Valley without further incident, to which his reply was, "No, sir." The defendants objected to any evidence of what occurred other than at Mrs. McClain's on 19th street. The trial court sustained the objection and in this regard we are left uninformed.

On cross-examination, Oden said he called the union hall upon direction of his Pauls Valley office. The record discloses that in response to this call, Mr. Lair, Vice-President of the union, came out, though Mr. Oden testified he was there all the time. (In this, it is obvious he was confused, since the undisputed record shows that Lair came in response to Oden's call.)

Officer Stevenson testified none of the union men were there when he arrived. He was there about thirty minutes with Police Captain Tom Webb and Officer Phillips. Before the policemen left, four union men came in a car and parked diagonally across the street intersection. Lair had left and these men were apparently Bryant, Horton, Turner, and Black. Captain Webb talked to them, so Officer Stevenson testified. He further related nothing unusual occurred while he was there and no arrests were made. He was able to identify only two of them, Mr. Bryant and Mr. Horton. His testimony discloses all the officers left at the same time and the union men were still across the street in the car. The record does not disclose anything of a disturbing nature occurred after the Police left the scene.

The State's evidence was thus concluded and the defendants demurred on the ground, "said evidence fails to state any—facts to prove any of the allegations alleged in the information. More specifically, the evidence does not show that the defendants at any time acted conjointly and in concert with each other. The evidence does not show that they were illegally present in the vicinity of 3000 N. W. 19th Street, and the evidence does not show that three or more persons, acting conjointly, in a manner adapted to disturb the peace or excite public alarm, and the evidence fails to show that they did disturb the peace and excite public alarm." The trial court overruled the demurrer with exceptions.

The defendants testified in substance as follows: Gordon Bryant related that at the time these things complained of allegedly occurred, he was employed by Tom Munday Moving and Storage Co. Munday's was one of the eleven companies out on strike on July 11, 1956. He said that after walking picket at Munday's warehouse, he and Fritz Black started out in his automobile to check the W. W. Warren Transfer Co. This mission having been accomplished, they returned to the union hall via N. W. 36th and May Avenue. At 19th street, they made the observation as hereinbefore related by Black. Bryant testified further that Reliable Van Lines in Oklahoma City was the agent for Mayflower Transit Company. As hereinbefore said,

they were among the eleven companies on strike. Report was made to the union headquarters to the secretary in the office, no union official being present, and the secretary stated she would take the message. He did not talk to any other members of the union at that time, he testified. He and Black returned to 19th and May Avenue. They did not get out of their car, he said, but watched for a few minutes and in a short time Mr. Oden and his helper came out of the house loading furniture on their truck. About that time, C. B. Horton and Bill Turner arrived in Turner's car. He said he assumed they had spotted the truck as he and Black had done. Mr. Lair came in a short time, in response to Oden's call and this information, but before he got there, "we four men talked to Oden the driver of the Mayflower truck who called for a union official." Upon being pressed as to the reason why he went out to Mrs. McClain's, Bryant said: "I thought maybe if we went out there and explained it to him he would unload voluntarily and leave." He further related, "If he (Oden) showed me a bill of lading or something to convince me that it was not booked by Reliable Van Lines, then we wouldn't have had no call whatsoever to even be interested in that move." Oden said he had a bill of lading which showed that the move was only to Pauls Valley. Bryant told him that did not have a whole lot to do with it since Reliable Van Lines would get a commission for getting the job. "Oden and I walked around the truck to the cab to get the bill of lading, and he was showing it to me. It was a standard form bill but it was blank as to the booking agent."

This testimony was not denied in rebuttal since the State offered none. The facts as revealed by the bill of lading did not relieve Bryant's suspicion that this was a strike breaking operation, he said. In fact, Bryant testified, "I thought it did not prove Reliable did not have the job." No one was present during this five or ten minute conversation except Bryant and Oden, the record shows. It is not denied

that the other union men were at the back of the van out of hearing distance. Bryant positively denied making any threats to Oden as charged. He testified his only purpose in talking to Mr. Oden was to see if Reliable booked the job and to convince him it would be showing a disregard to "our privileges and rights." He positively denied that he had any prior understanding with Horton, Turner, Lair, or others as to what he would say or do to the truck driver. In this, he is corroborated by the other defendants. There is neither direct proof in the evidence nor circumstances showing that Lair, Horton, and Turner knew he intended to make any threats. Nothing shows they had knowledge of the threat or adopted the threat, if one were made. Bryant further testified that Mrs. McClain asked how she was going to get moved if Oden did not move her. To this he replied that if they "were convinced that Reliable did not book the job, we would let the Mayflower driver go ahead, because we would have nothing to do with this strike." He testified he was not there when the police came. He said he was informed the others did talk to Captain Webb, later. No reason appears in the record why Captain Webb and Officer Phillips were not called as witnesses. Officer Stevenson corroborated the fact that Captain Webb talked to the men in the car.

Apparently, the police officers did not find any evidence of unlawful assembly or a situation that had in it the seeds of rout or riot, else they would have remained there, or at least ordered the participants to retire. 21 O.S.1951 § 1316. If an officer's order of dispersal had been given, then all who remained contrary to said order would have been guilty of a misdemeanor, under this section of the statutes. It is apparent they gave no such order and made no arrests because they saw nothing and found no evidence to support such an order of retirement and an arrest. In other words, they did not find that the defendants were acting other than within their lawful rights.

Defendant C. B. Horton testified he did not see Bryant or Black but got his information about the Mayflower truck from the secretary in the union hall. He testified no one was there at Mrs. McClain's when he arrived with Bill Turner, except Black and Bryant. He said he heard no one make any threats to Oden. On cross-examination, he said he did not know Black and Bryant had preceded him and Turner to Mrs. McClain's. He said after the discussion ended at Mrs. McClain's, they all went across the street, sat in an automobile, visited, and ate their lunch.

Oscar Lair testified he was informed by the girl in his office a call had come in from a Mayflower truck driver for a representative of the union to come to Mrs. McClain's. When he got there, he said, he talked only to Mrs. McClain and Mr. Oden out of the presence of the other union men. He testified his purpose in going out there was to keep down any violence or any disturbance that might give the union a black eye in the eyes of the public. He said he assured Mr. Oden that nothing would happen so far as his union people were concerned if he went ahead and loaded. He said he stated to Oden that his union men were out on strike because of substandard wages and they were trying to improve their conditions which he, Oden, was breaking down if he did not respect the strike. He denied making any threats and as hereinbefore related, Oden charged none to any other than Bryant. He testified he told Mrs. McClain that if the driver did not want to load her furniture, there were other companies not on strike and she could call one of them. He also testified that he told Oden that the union did not sanction the use of violence or misconduct and would have asked the union men to leave if he had observed any threats of violence. He related, however, he remembered Mr. Oden said someone made a threat against him. That, he said, was when he told Oden the union did not sanction threats; that "under the Taft-Hartley law we don't have any means of *discipling* our men so far as having any responsibility over our members we do not have." This evidence stands unrefuted.

No further witnesses were called. It is pertinent that the State offered no evidence in rebuttal. Moreover, the State did not subpoena Mr. Oden's wife, whom, Oden testified, heard some of the conversation, or Oden's helper, who was also present during some of the transaction. They did not offer Mrs. McClain's son who was present, and called only one police officer when five officers were listed in the information.

■ This is a case of first impression and interpretation, as applied to labor disputes, of the Oklahoma Statute, 21 O.S.1951 § 1314, defining unlawful assembly, reading as follows:

"Wherever three or more persons assemble with intent or with means and preparations to do an unlawful act which would be riot if actually committed, but do not act toward the commission thereof, or whenever such persons assemble without authority of law, and in such a manner as is adapted to disturb the public peace, or excite public alarm, such assembly is an unlawful assembly."

A violation of the foregoing may be punished as a misdemeanor, not to exceed one year in jail or a fine of $500 or both. 21 O.S.1951 §§ 10, 1315. In construing the foregoing statute, resort may be had to historical background, common law sources, and the construction and interpretation placed on similar statutes by other courts. It must be measured by, first, the United States Constitutional right of freedom of assembly and freedom of speech as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Amendment I, U. S. Const., and the Oklahoma Constitution, Art. 2, Sec. 3, to the effect the people have the right to peace·

ably assemble for their own good. A predicate for these rights was, of course, the Magna Charta, Petition of Rights, and the Bill of Rights in English jurisprudence. On this foundation, it has been held that the constitutional guaranty of the "right of assembly must be given the most liberal and comprehensive construction." But, it has also been said that "this inestimable boon of liberty" is "to be enjoyed by the people in a peaceful and law-abiding manner." State v. Butterworth, 104 N.J.L. 579, 142 A. 57, 58, 58 A.L.R. 744. The origin of the law against unlawful assembly antedates the constitutional provision of the United States insuring the right of lawful assembly. In fact, the law against unlawful assembly reaches into the distant past of common law. In Wise on Riots and Unlawful Assembly, 4th Ed., p. 2, it is said:

"The earliest definition of an unlawful assembly is in the year-book 21 Hen. 7, 39. It would seem from it that the law was first adopted at a time when it was the practice for the gentry who were on bad terms with each other to go to market at the heads of bands of armed retainers. It is obvious that no civilized government could permit this practice, the consequence of which was at the time that the assembled bands would probably fight, and certainly made peaceable people fear that they would fight."

At page 12, Wise gives an early refined common law definition of unlawful assembly, as follows:

"An unlawful assembly is an assembly of three or more persons who, with intent to carry out any common purpose, in such a manner, or so conduct themselves when assembled as to cause persons in the neighborhood of such assembly to fear on reasonable grounds that the person so assembled will disturb the peace *tumultously,* or will, by such assembly, needlessly and without any reasonable occasion, provoke other persons to disturb the peace *tumultously.* Persons lawfully assembled together may become an unlawful assem-
bly if they conduct themselves with a common purpose, in such a manner as would have made their assembling unlawful if they had assembled in that manner for that purpose."

Under English common law, as it developed, there were many facets of the offense of unlawful assembly, condemning and penalizing, such as; tumultuous petitions to the King, under which the number of names on a petition was not to exceed twenty and limiting the number of persons delivering the petition to the King to ten. Furthermore, the law prohibited meetings for petitions within a mile of Westminister Hall and limited the number of people in said assemblies to fifty persons. The early law also prohibited unlawful military drilling for the purpose of overawing the government. It prohibited unlawful societies for real or supposed seditions of treasonable nature. Moreover, the early law prohibited forcible entry and detainer by violently taking and keeping lands and tenements by force of arms and without authority of law. The law against unlawful assembly was designed to prohibit smuggling, rout, and riot. Under unlawful assembly charges of unlawful drilling, as well as the maintenance of treasonable societies, the American colonists felt the monarchial heel upon their necks in an effort to destroy the seeds of the American revolution. Hence, the constitutional provision in both Federal and State constitutions against the interference with lawful assembly. At the same time, the public peace and welfare require that unlawful assemblies be "nipped in the bud" before they get out of hand and become riots. Hence, the law against unlawful assembly under the Oklahoma Statute, supra.

The American statutes against unlawful assembly thus originated from the foregoing common law concepts, and the Oklahoma statute was taken from the Dakota Compiled Laws of 1887, § 6680. Only two cases construing the Oklahoma Statute against unlawful assembly have been written, neither of which is in point with the situation at bar. Crawford v. Ferguson, 5

Okl.Cr. 377, 115 P. 278, 45 L.R.A.,N.S., 519; Casteel v. State, 13 Okl.Cr. 19, 161 P. 330. Hence, we are confronted with the difficult task of landmarking the Oklahoma statute so that under applicable conditions the constitutional provision of lawful assembly may be protected and at the same time unlawful assembly may be discouraged and guilty parties punished.

The first question confronting us is what are the essential elements of unlawful assembly, and second, by that standard, do the facts offered in the case at bar constitute a case of unlawful assembly?

In answer to the first inquiry, the essential elements of unlawful assembly are, both at common law and generally under the statutes of Oklahoma and most of the other states: (1) Three or more persons must be assembled; (2) they must be assembled to do an unlawful act or being assembled shall attempt to do a lawful act in a violent, unlawful, and tumultuous manner to the terror and disturbance of others; (3) the three or more persons must have a common purpose and act in concert to do the act complained of; (4) the intent or purpose necessary to render an assembly an unlawful assembly need not exist at the outset but may be formed either at, or after the time of the assembly; (5) it is immaterial whether the object which persons composing the assembly have in view is lawful or unlawful if the intent is to affect the object of the assembly in such manner as to give firm and courageous persons in the neighborhood of such assembly ground to apprehend a breach of the peace in consequence of it. 91 C.J.S. Unlawful Assembly § 2 a, b, p. 496; State v. Woolman, 84 Utah 23, 33 P.2d 640, 93 A.L.R. 723; State v. Butterworth, supra. In State v. Woolman, supra [84 Utah 23, 33 P.2d 644] it was said:

"* * * persons may be a part of a lawful assembly, assembled for an innocent or lawful purpose and occasion may arise whereby two or more of such assembly may riot, or cause a riot, or, rout without converting the assembly as such into an unlawful assembly or forming another assembly."

By the same token, if one in a lawful assembly acts unlawfully without concurrence of the others, he alone would be guilty of a law violation. In Wise on Riots and Unlawful Assemblies, supra, page 38, it is said:

"It may, in the first place, be safely laid down that much stronger evidence of the means to inspire terror, and of the execution of the purpose, will be required when the meeting and purpose are in themselves lawful * * than when they are unlawful, and directly causing a breach of the peace."

If a lawful assembly degenerates into an unlawful one, "concurrence would be evidence of evil intention in them that concur, so that it is riot in them that act and no more." Wise, supra, p. 36; Sate v. Martinez, 53 N.M. 432, 210 P.2d 620. On a prosecution for unlawful assembly, in determining whether others participated with defendant in a threat it is sufficient to show the adoption by them of his language exhibited by their conduct. 91 C.J.S. Unlawful Assembly § 5, note 68, p. 500. Hence, by deduction, if the assembly be a lawful one and a party does an unlawful act not concurred in by the others lawfully assembled, that individual's unlawful act alone would not convert the lawful assembly into an unlawful one. The court in People v. Most, 128 N.Y. 108, 27 N.E. 970, 972, said:

"The offense can only be committed when there is a concert or combination of three or more persons who unite in the attempt or the threat to do one or more of the things specified by the statute. A threat made by one or by two persons only, in which no others participated, would not be indictable * * * although made in an assembly of many persons."

The defendants herein were entitled to an instruction along these lines. But, if the evidence did not establish an unlawful assembly, yet did establish unlawful individu-

al acts by one or two, the one or two would be individually accountable for their unlawful acts.

"The intent with which such persons assemble" it has been said, is "the very essence of the offense" of unlawful assembly. Dutcher v. State, 16 Neb. 30, 19 N.W. 612, 613. Intent is often times a thing difficult to determine as to a person charged. In many instances it can be determined only by language, acts, conduct, and circumstances indicating adoption of the unlawful conduct of another person. These conditions of proof may be established either by direct proof or by circumstantial evidence. If by direct proof, the situation presents no difficulty. If proof of intent by showing acts of adoption is by circumstantial evidence, then to sustain a conviction, the proof must be inconsistent with innocence and consistent only with guilt. Brady v. State, 57 Okl.Cr. 203, 46 P.2d 963; Fields v. State, Okl.Cr., 284 P.2d 442.

The elements necessary to the proof of a case of unlawful assembly being thus established, and the prosecution being penal in nature, the burden is upon the State to prove them beyond a reasonable doubt. 91 C.J.S. Unlawful Assembly § 5, pp. 499–500. With these legal principles in mind, we must determine if the proof, under proper instructions, meets the elements defining unlawful assembly.

Before applying the foregoing principles to the facts in the case at bar, we must first ascertain what the rights of labor are in disputes such as the one herein involved. Standard Tube and Forkside Co. v. International Union, Dec. 26, 1899, 9 Ohio Dec. 692, defines the rights of labor at that time when they were not so extensive as now:

"The right of workmen to combine for their own protection, and to persuade in a reasonable manner fellow workmen to join them or to refrain from taking the places made vacant by them, is clearly recognized in the decisions of the courts. The legality or illegality of their acts, therefore, must be determined by the manner in which they attempt to exercise such influence or persuasion. While recognizing the right of men to strike and to draw others to their support in so doing, the law requires that in bringing influences to bear over those whom they wish to make common cause with themselves, the striker's conduct shall be such as recommends itself to reasonable men; and if he goes farther than this, and attempts to accomplish such ends by resorting to methods calculated to intimidate such laborers as desire to work, he then exceeds the limits that the law allows."

In Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 2 Cir., 145 F.2d 215, 221 (noted in 29 A.L.R.2d 374, 409) (reversed on other grounds, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939) defining labor's rights under the U.S.C.A., it was said:

"Hereafter, * * * it can no longer be considered illegal for any person or persons, singly or in concert, to cease or refuse to perform any work or labor or peacefully to persuade any person to work or abstain from working, or to cease to patronize any party to such dispute, or to recommend, advise, or persuade others by peaceful and lawful means so to do. 29 U.S.C.A. §§ 52, 104. And a labor dispute includes, inter alia, 'any controversy concerning terms or conditions of employment * * * regardless of whether or not the disputants stand in the proximate relation of employer and employee'; and a case grows out of a labor dispute when it involves persons engaged 'in the same industry, trade, craft, or occupation; or have direct or indirect interests therein,' whether it is between employers and employees, or employers and employers, or employees and employees, or associations of each, or when it involves 'any conflicting or competing interests' of persons 'partic-

ipating or interested' in the dispute. 29 U.S.C.A. § 113."

Virtually to the same effect is the case of American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360.[1]

Oklahoma's position in this regard is set forth in Ex parte Sweitzer, 13 Okl.Cr. 154, 162 P. 1134, wherein this court said:

"Section 3764 Rev.Laws 1910, [40 O.S.1951 § 166] construed, and held, that it stays the hand of both civil and criminal process from interfering with 'picketing,' or other peaceable and legitimate endeavors of labor, to further their interest in trade disputes, between themselves and their employers."

Also Lockett v. Construction Trades Union, 207 Okl. 484, 250 P.2d 468 citing Ex parte Sweitzer, supra.

▪▪ Under these principles, and the evidence of this case, the law does not allow us to presume that the object of the parties in going to Mrs. McClain's home was anything other than lawful, in the absence of clear proof to the contrary. Proof of unlawful purpose alone must be relied on. We cannot supply that proof. Conjecture, speculation, suspicion, and surmise will not suffice to sustain a conviction. Under the law, every person is presumed innocent until proven guilty beyond a reasonable doubt. Certainly the foregoing evidence is not sufficient to establish an understanding prior to the assembly in the public street to do either an unlawful thing or a lawful thing in an unlawful manner. The record is void of evidence as to any prior agreement.

▪ But, did the assembly, lawful at its inception, become unlawful after it was formed? There is no direct proof of concurrence of the others in the evil intent manifested by Bryant. In fact, nothing more appears than the circumstance that they were present in the vicinity but not in the hearing of Bryant's conversation with Oden, and that some of them remained at the scene until the truck pulled away. This evidence, alone, is insufficient to establish a common unlawful purpose of the defendants by adoption of Bryant's threat either before, at the time of, or after the assembly. Nothing in the record shows that Horton or Lair concurred in the threat or that Lair was there for any other purpose than peaceful persuasion and to keep anything from occurring that might arouse public sentiment against the union. The law gave the defendants the right to go to Mrs. McClain's for the purpose of peaceful persuasion and picketing. The record supports the proposition, inclusive of Bryant, that their mission was peaceful, up to the point of Bryant's threat. Their mission being a peaceful one, recognized by law, their assembly in itself was therefore not unlawful. Unless the record shows adoption of Bryant's threat by Lair, Horton, (and Turner), they would not be guilty of an unlawful assembly. We are of the opinion that the record is void of substantial proof in this regard essential to convert the assembly into an unlawful one. The fact that some of the defendants remained in the vicinity after the threat, within itself did not constitute an unlawful act so long as no overt act was committed designed to show adoption of Bryant's threat. This record shows no such acts, and they were not trespassers in being in the street. To say the least, the fact they remained in the vicinity created nothing more than a strong suspicion which is not sufficient to take the place of proof. It is now axiomatic that opportunity to commit a crime is not a substitute for proof of the commission of a crime.

Mrs. McClain's testimony by no stretch of the imagination tends to establish the elements of unlawful assembly or to support the necessity of police escort out of town. The fact that both Oden and Mrs. McClain may have concluded a police escort was necessary does not supply the proof of necessity herein. The whole case

---

1. Opinion by former Chief Justice Taft.

is predicated upon Oden's testimony alone to establish the essential elements necessary to sustain a conviction. Its inadequacy is apparent as to Horton and Lair, as well as Turner. It might possibly sustain a conviction of Bryant for assault. We repeat, as to Lair and Horton, this record rises no higher than surmise, speculation, innuendo, and strong suspicion. Moreover, the conduct of defendants Lair and Horton is not inconsistent with innocence and certainly not consistent only with guilt.

■■■ However, quite a different situation might have been developed at the trial if the court had permitted proof of what transpired on the way out of town and to Pauls Valley. Evidence of the defendant's conduct thereon might have disclosed, through direct evidence, acts of adoption of Bryant's threat. Such evidence was clearly admissible and it was error for the trial court to exclude the same. But, we cannot indulge in speculation as to the nature of what Mr. Oden may have had in mind when the trial court stopped the inquiry thereon. On retrial, such evidence, if there be such, might establish the missing element necessary to support a conviction. The County Attorney in determining further action herein should explore the evidential possibilities of this feature of the case. It might be determinative of further prosecution.

■■■ The instructions given on a trial must be pertinent and it is reversible error for the trial court not to instruct on the fundamentals of a case. 91 C.J.S. Unlawful Assembly § 6, note 75, p. 500; Koss v. State, 217 Wis. 325, 258 N.W. 860. In light of the evidence and the principles of law hereinbefore set forth, it is apparent that the trial court's instructions were entirely inadequate. The trial court gave no instructions covering labor's rights of peaceful persuasion and picketing, as to adoption of the threat, and circumstantial evidence. Under the record herewith presented, without adoption of Bryant's threat, essential herein to concurrence, there could be no guilt. In the absence of an instruction concerning the law as to an adoption of the threat, the jury was unprepared to consider the same according to the law. Moreover, since the questions of concurrence and adoption are predicated entirely upon circumstantial evidence, (and very little of that), it was essential that the jury be instructed upon the question of what consideration they were to give circumstantial evidence. The jury should have been instructed that as to concurrence by Horton and Lair and adoption by them of Bryant's threat, the evidence is entirely circumstantial, and it must point conclusively to their guilt and be inconsistent with their innocence, and exclude every reasonable hypothesis than that of guilt. Their guilt hinged upon this point, and the court should have instructed the jury on it. Matthews v. State, 8 Okl. Cr. 676, 130 P. 125. These instructions went to the very heart of the defendant's defense and were fundamental. Every defendant has the right to have the jury instructed on the theory of his defense. It was the duty of the trial court to give such instructions, whether request was made therefor or not. Matthews v. State, supra; Palmer v. State, 78 Okl.Cr. 220, 146 P.2d 592; Adams v. State, 93 Okl.Cr. 333, 228 P.2d 195; Crossett v. State, 96 Okl.Cr. 209, 252 P.2d 150. It is the function of instructions that every citizen who invokes the right of trial by jury be tried according to law embodied in the instructions and not by guess. Failure to so instruct constitutes denial of the right to a fair trial. As to circumstantial evidence, it has been repeatedly held where the evidence to support defendant's guilt is in whole or in part circumstantial, it is the trial court's duty to instruct on the principle applicable to circumstantial evidence. Jones v. State, 69 Okl.Cr. 244, 101 P.2d 860.

■■■ Furthermore, as hereinbefore indicated, the trial court should have instructed the jury on the right of labor to resort to peaceful persuasion and lawful picketing. The jury should have been told that if from the evidence they found that the conduct of Lair and Horton was

compatible with peaceful persuasion and lawful picketing and the evidence as to them did not show concurrency in Bryant's threat, then their verdict as to Lair and Horton should be, not guilty. In fact, under this record, none of the defendants could be convicted of unlawful assembly because of the lack of evidence of concurrence in Bryant's threat by at least two of them. But, that fact would not exempt Bryant from prosecution for his unlawful conduct. We are of the opinion that the trial court's failure to so instruct the jury in the above regard was fundamental and reversible error. As was said in Polk v. State, 26 Okl.Cr. 283, 224 P. 194, 205.

> "It is undoubtedly the law that the accused in any criminal action is entitled, as a matter of right, to require in the first instance a compliance with the ordinary rules and forms of law that secure to him a fair and legal trial."

The trial court is not to be criticized, for it was without precedent in Oklahoma by which to chart his course.

In Great Northern Ry. Co. v. Local Great Falls Lodge of International Ass'n of Machinists, No. 287, D.C., 283 F. 557, 561, it was said:

> "[Labor] may go to the very line between lawful and unlawful, carefully avoiding crossing into forbidden territory."

We do not believe in this doctrine that anyone should press their case to the very brink of unlawfulness, for that doctrine constitutes both a temptation and the atmosphere for provocation of law violation. Moreover, labor should not trust its affairs of persuasion in the hands of those uninformed in the law of such matters. Such matters should not be entrusted to those whose disposition is unstable and whose temper is easily disturbed, but only to those of stability who are versed in their lawful rights. Only those best fitted for such missions should be chosen, and certainly that choice should be from among the official family or specially trained committeemen, not in a haphazard manner of swarming, as was the case herein. The barrier between unlawful assembly, rout, and riot is so close that its breaking point is often one hot-head, as in the case at bar, who involves himself and his associates in the meshes of the law and destroys public sentiment so essential to the well being of labor. Labor should become impressed that it has been rightfully said, "Unlawful assembly is the inception of riot." Wise, supra, p. 17; Schoolcraft v. State, 84 Okl.Cr. 20, 178 P.2d 641. A large number of delegates creates the impression of unlawful assembly and the disposition to use force or violence. By no means should such missions resemble an onslaught in force. We hold that the persuasion of such delegations should not be abusive, threatening, or violent in character, or dogging in persistence, and should not obstruct or interfere with an unwilling listener. These prescriptions will tend towards preserving the peace and not encourage its breach. Moreover, they will not constitute an infringement on peaceful picketing or curb the use of art, eloquence, oratory and logic to accomplish persuasion, or indulgence in fair, vigorous, and repeated argument to those who are willing to listen. Great Northern Ry. Co. v. Local Great Falls Lodge of International Ass'n of Machinists, No. 287, supra.

▮ Society has assumed labor's part and discharged its responsibility by recognizing certain procedure as the lawful means of persuasion and picketing. 40 O.S. 1951 § 166; Ex parte Sweitzer, supra. But, these prescriptions do not countenance threats or acts of violence. Labor should so conduct itself as to avoid the appearance of evil, much less the charge of evil doing. Labor must assume its reciprocal responsibility in order that the legal striking and picketing processes of law established for its benefit are not used in an unlawful manner. Labor must understand, as must every American, that for every right there is a corresponding duty not to abuse or misuse that right.

All the judges agree that the circumstantial factual situation in this case presents a condition on which the jury should have been adequately instructed. The majority is of the opinion that in light of the foregoing principles of law and the insufficiency of the evidence, to affirm this conviction would deny the defendants of their right to due process. In every trial, equality before the law demands equal justice for all, regardless of political persuasion or the pressure of public sentiment. This, we believe, the defendants have been denied.

For all of the foregoing reasons, the convictions herein are accordingly reversed with directions to the County Attorney and the lower court to proceed in a manner not inconsistent with the principles herein announced.

NIX, J., concurs.

POWELL, J., concurs specially.

POWELL, Judge (concurring specially).

Although the point was not raised or urged by defendants, either in the trial court or in this appeal, and ordinarily could not be considered, after a careful study of the record and the authorities cited by Judge Brett, I am persuaded, from the reasons set out in his opinion, that the defendants are entitled to a new trial, limited to the failure of the trial court to instruct the jury on the fundamental elements of the crime charged.

And I concur particularly in paragraph 15 of the syllabus, where it is said:

"On a prosecution for unlawful assembly involving a labor dispute, the questions of labor's rights of peaceful picketing and persuasion, of adoption of and concurrence in a threat made by one, and in the case at bar circumstantial evidence, are fundamental and the failure of the trial court to so instruct constitutes fundamental and reversible error."

I cannot agree, however, that there was not sufficient evidence, though circumstantial, believed by the jury, to support conviction of the defendants of the crime charged. I would dwell on this point as an aid in the future disposition of this case. I would quote from the information and set out the statute covering the offense charged.

The pertinent portion of the information reads:

"On the 11 day of July, A. D. 1956, in Oklahoma County, State of Oklahoma, Oscar Lair, Gordon Bryant, Bill Turner and C. B. Horton, whose more full and correct names are to your informant unknown, then and there being, did then and there wilfully, unlawfully and wrongfully commit the crime of Unlawful Assembly in the manner and form as follows, to-wit:

"That is to say, the said defendants, in the County and State aforesaid, then and there being, did then and there while acting conjointly and together and in consert, wilfully, unlawfully and conjointly assemble in the immediate vicinity of the Ralph McClain residence at 3000 N. W. 19th Street, in Oklahoma City, said County and State, without authority of law, and in a manner adapted to disturb the public peace and excite public alarm, and the said defendants did in fact disturb the public peace and excite public alarm; contrary to the form of the statutes * * *" etc.

Section 1314 of Title 21 O.S.1951, the statute under which the information was filed, reads:

"Whenever three or more persons assemble with intent or with means and preparations to do an unlawful act which would be riot if actually committed, but do not act toward the commission thereof, or whenever such persons assemble without authority of law, and in such a manner as is adapted to disturb the public peace, or excite public alarm, such assembly is an unlawful assembly."

The above statute was adopted during territorial days from Compiled Laws of Dakota 1887. Counsel for both the defendants and the State agree that there are few cases construing similar statutes, and none have been cited where the issues were parallel to those in the within case. We have read the cases cited by counsel for defendants, but by reason of the factual differences, they have not been of much aid.

The undisputed evidence shows that the defendants were members of Local Teamsters Union No. 886, and that the transfer and storage employees of Oklahoma City who belonged to Local Union 886 were on strike. There were eleven companies on strike, one being the Reliable Van & Storage Company, the booking agent in Oklahoma City for Mayflower.

There is no doubt but that the union people had the right to assemble together, had the right to picket and had the right to talk to Charles Oden, driver of a truck they thought belonged to a company involved in the strike. They did not have the right to threaten and intimidate Oden, or use violence. The law covering this has been ably developed by Judge Brett in his opinion.

The question the jury had for determination was whether the assembled strikers threatened the driver of the Pauls Valley truck, or whether their actions and conduct disturbed the public peace or excited public alarm, under the provisions of 21 O.S.1951 § 1314, supra.

It would require too much space to set forth and discuss in detail the evidence and circumstances to support my thought that there was sufficient evidence to justify the court in submitting the case to the jury. I will point out only a few circumstances.

There was competent evidence, supported by other circumstances, to show that some five teamsters, union men, "swarmed" the Pauls Valley truck that was at the Ralph McClain residence at 3000 N. W. 19th Street, Oklahoma City, to move the McClain household goods to Pauls Valley. The defendants were not convinced by the driver of the truck that his employer was not involved in the strike, and the driver was caused to quit loading furniture by reason of their conduct, from about noon until five o'clock, before loading commenced under police protection.

The driver of the Pauls Valley truck identified the defendant Bryant as the man who threatened him. He said: "There were some men come and told me—well, told me to stop." Said he:

"I was told that the strike was against the long distance movers of Mayflower, which my truck had painted Mayflower, their colors; I assured them it was not an interstate move, it was only a local from Oklahoma City to Pauls Valley, and I believe the accusation was given that it was being booked by a company in Oklahoma City and we were handling it. I assured him it wasn't.

"Q. What else was said that you recall? A. I offered to let them see my bill of lading to prove it was booked by my firm, my home firm in Pauls Valley.

"Q. What was said to that? A. Well, I showed my papers to one man. Well, he told me that I had better unload the furniture, and after I showed him, I tried to reason with the man and assure him that I wasn't involved in the strike, I wasn't union, and I wasn't involved. * * * I tried to reason with him and he wouldn't listen to my reasoning.

"Q. And what did he tell you? A. Well, he said I would get a busted head and my truck turned over."

When the driver got witnesses and asked Bryant to repeat his threats, he in effect treated the matter lightly, as if a joke, and changed his tactics to tongue-in-cheek politeness. Still, he did not mean to permit the furniture to be hauled.

Mrs. McClain testified that she talked to the defendants and that, "I was just a little bit upset at the time."

Charles Oden, the driver of the Pauls Valley truck, testified that a vice president

of the Teamsters' Union came out, and, said he: "I asked him if the union sanctioned violence and threats, and he told me he wasn't responsible for his men when they were off duty."

A study of all the evidence is convincing that the defendants, with the possible exception of the defendant Lair, did not intend to permit the truck to be loaded and make the trip to Pauls Valley, and that the protection afforded by the police and the Highway Patrol is the only thing that prevented violence.

Four union men, shown to have been Bryant, Horton, Turner and Black, parked their car diagonally across the street from the Pauls Valley truck while these men watched that truck. No picket line was put in operation, but such action by the four could not but cause apprehension and fear of momentarily being pounced upon, if the threats had been made as testified to by driver Oden.

Witness Oden testified further:

"Q. When you completed the loading and moved, did anybody go with you? A. We had police escort.

"Q. How far did they go with you? A. City limits.

"Q. Then what happened? A. Then we had highway patrol escort.

"Q. You arrived in Pauls Valley then, without further violence? A. No, sir.

"By Mr. Grayson: We object to anything that happened outside the immediate vicinity of 3000 Northwest 19th.

"The Court: Sustained.

"Q. You continued, then to Pauls Valley with highway patrol escort, is that right? A. That's right."

The ruling of the court constituted grievous error, as the evidence up to this point supporting the testimony of witness Oden as to threats had been circumstantial and particularly as to the adoption or concurrence in the threats by the co-defendants of Bryant. Judge BRETT'S opinion concedes that if the evidence had developed that further threats had been made by defendants, or violence attempted, then without doubt the evidence would have been sufficient to have supported the verdict, absent other errors.

I am convinced from the evidence that witness Black, a colored union man who testified for the State, was confused in testifying that defendant Lair, vice president of Teamsters' Local 886, accompanied his co-defendants from the union hall to the scene of the trouble. It is apparent from all the evidence except that of Black that Lair did not arrive at the scene until at least fifteen minutes after Mr. Oden, the Mayflower truck driver, had phoned the union office to send an official out there. The evidence discloses, however, that a union official, Mr. Streeter, was with the first group to arrive, and in a group talked to the truck driver, Oden and that Mr. Streeter left in about five minutes and then Mr. Lair arrived. This thought conflicts with the testimony of witness Black, as indicated, and it was within the province of the jury to weigh the evidence, and not ours, and this principle prevents the appellate court from setting aside the judgment as to defendant Lair.

I feel impelled to say that in view of the fact that no weapons of any kind were in evidence, and that the evidence to support witness Oden was strictly circumstantial, in absence of light on what happened after the truck got on the way to Pauls Valley, it is difficult to understand how the trial court could assess the maximum fine for a misdemeanor.

There has been a dearth of authority interpreting statutes as ours, and I am in accord with Judge BRETT'S painstaking opinion, which should in the future aid prosecuting officials and the courts in avoiding the errors as found in the within case. I am in agreement except as to the sufficiency of the evidence to make out a case, and believe the defendants are by reason of the error set out entitled to a new trial.